The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
December 12, 2024

## 2024COA125

**No. 22CA2219, *Frisco Lot v. Giberson Preserve* — Real Property — Common Interest Communities — Common Interest Ownership Act; Colorado Rules of Appellate Procedure — Briefs in Cases Involving Multiple Appellants and Appellees**

In this property dispute, a division of the court of appeals sets forth, as a matter of first impression, the test to determine whether a subdivision created before the enactment of the Colorado Common Interest Ownership Act (CCIOA) qualifies as a common-interest community. Drawing from *Evergreen Highlands Ass'n v. West*, 73 P.3d 1, 8 (Colo. 2003), and the Restatement (Third) of Property: Servitudes (Am. L. Inst. 2000), the division concludes that a pre-CCIOA common-interest community exists when individual properties are burdened with a servitude that imposes an obligation to either (1) pay for the use of or contribute to the maintenance towards commonly held or enjoyed property or

(2) pay dues or assessments to an association that provides a service or enforces a servitude on commonly held or enjoyed property.

Additionally, the division concludes that under C.A.R. 28(h), a party may not both file a separate brief and incorporate by reference the brief of another party. Such a violation of Rule 28(h) may result in the striking of any improperly incorporated argument.

COLORADO COURT OF APPEALS      **2024COA125**

Court of Appeals No. 22CA2219
Summit County District Court No. 19CV30037
Honorable Karen A. Romeo, Judge

Frisco Lot 3 LLC, a Colorado limited liability company; Frisco Lot 4 LLC, a Colorado limited liability company; and the Jeffery W. Sandri Revocable Trust,

Plaintiffs-Appellants and Cross-Appellees,

v.

Giberson Limited Partnership, LLLP, a Colorado limited liability limited partnership; Giberson Preserve Homeowners Association, Inc., a Colorado nonprofit corporation; Mark Timberlake, Board Member; Chad G. Asarch, Board Member; and Gary Giberson, Board Member,

Defendants-Appellees and Cross-Appellants,

and

Gary Giberson; Gloria Giberson; Daniel J. Ferrari; and Colorado Open Lands, a Colorado nonprofit organization, f/k/a Continental Divide Land Trust,

Defendants-Appellees.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE KUHN
Gomez and Richman*, JJ., concur

Announced December 12, 2024

Ciancio Ciancio Brown, P.C., Marc J. Kaplan, Denver, Colorado, for Plaintiffs-Appellants and Cross-Appellees

Anderson Notarianni McMahon LLC, Joshua D. McMahon, Denver, Colorado, for Defendant-Appellee and Cross-Appellant Giberson Limited Partnership, LLLP

Hall Booth Smith, P.C., Elizabeth C. Moran, Bradley N. Shefrin, Greenwood Village, Colorado, for Defendants-Appellees and Cross-Appellants Giberson Preserve Homeowners Association, Inc., Chad G. Asarch, Mark Timberlake, and Gary Giberson

Foster Graham Milstein & Calisher LLP, Michael G. Milstein, Steven J. Wienczkowski, Denver, Colorado, for Defendants-Appellees Gary Giberson and Gloria Giberson

Daniel J. Ferrari, Pro Se

Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Bill E. Kyriagis, Nicholas Gunther, Denver, Colorado, for Defendant-Appellee Colorado Open Lands

Conservation Law, P.C., Jessica E. Jay, Evergreen, Colorado, for Amici Curiae Land Trust Alliance, Keep it Colorado, Great Outdoors Colorado, Aspen Valley Land Trust, Colorado Cattlemen's Agricultural Land Trust, Colorado Headwaters Land Trust, Colorado West Land Trust, Crested Butte Land Trust, Estes Valley Land Trust, Montezuma Land Conservancy, and Palmer Land Conservancy

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     In this real property appeal, we consider whether a 1989 "Planned Unit Development Designation" and Plat created a common-interest community before the enactment of the Colorado Common Interest Ownership Act (CCIOA). Drawing from *Evergreen Highlands Ass'n v. West*, 73 P.3d 1, 8 (Colo. 2003), and the Restatement (Third) of Property: Servitudes (Am. L. Inst. 2000), we hold that a pre-CCIOA common-interest community exists when: (1) individual properties are (2) properly burdened with a servitude that imposes an obligation to either (a) pay for the use of or contribute to the maintenance of commonly held or enjoyed property or (b) pay dues or assessments to an association that provides a service or enforces a servitude on commonly held or enjoyed property. We then determine that the original owners failed to create a common-interest community. Consequently, we conclude that later lot owners are not subject to a subsequently created homeowners' association (HOA).

¶ 2     Additionally, we hold that under C.A.R. 28(h), a party may not both file a separate brief and incorporate by reference the brief of another party. Such a violation of Rule 28(h) may result in the striking of any improperly incorporated argument.

1

¶ 3     Finally, as described fully below, the parties raise various challenges to the trial court's (1) denial of a motion to dismiss; (2) grant of summary judgment; and (3) correction of a mistake in the judgment.  The parties also challenge (4) the effect of the trial management order along with the court order permitting counsel to withdraw and (5) the court's application of trust law to this dispute. We affirm in part, reverse in part, and remand with directions.

## I.     Background and Procedural History

¶ 4     This property dispute traces its origins to 1909 when the Giberson family received a 188-acre tract of land in Summit County under the Homestead Act.  Eighty years later, Charles Howard Giberson and Lura Belle Giberson (collectively, Giberson) executed the "Planned Unit Development Designation" (PUD).  The PUD subdivided their land into thirteen residential lots and a large open space known as the Giberson Preserve.  Giberson submitted the PUD and the subdivision Plat[1] to the county, and the Summit

---

[1] A plat is "a map describing a piece of land and its features, such as boundaries, lots, roads, and easements."  Black's Law Dictionary 1391 (12th ed. 2024).

County Board of County Commissioners (BOCC) approved it in 1989. It was promptly recorded.

¶ 5 About ten years later, Giberson executed a "Deed of Conservation Easement" granting the Continental Divide Land Trust an easement over land known as the conservation property. The land trust subsequently merged with Colorado Open Lands (COOL), a defendant-appellee. The conservation easement encumbered the open space with the intent of perpetually preserving its "agricultural character, wildlife habitat, open space and scenic qualities." After Charles Giberson passed away, Giberson Limited Partnership (GLP), a defendant-appellee and cross-appellant, took over his duties as the grantor of the conservation property.

¶ 6 In 2006, Daniel J. Ferrari, also a defendant-appellee, cross-claimant, and cross-appellee, became the first nonfamily member to purchase one of the residential lots. While conducting his prepurchase due diligence on the lot, he discovered the PUD and a set of unrecorded draft covenants but did not find an existing HOA. So Ferrari purchased Lot 8 and built a home, believing that it was not within a common-interest community. He was the first to

build a home on any of the thirteen residential lots.  Approximately two years later, Jeffery Sandri acquired Lots 3, 4, and 9.  On Sandri's behalf, the lots are held by plaintiffs-appellants and cross-appellees Frisco Lot 3 LLC, Frisco Lot 4 LLC, and the Jeffery W. Sandri Revocable Trust (collectively, Sandri).

¶ 7 One of the main disputes in this case involves the proper formation and authority of an HOA.  In 2008, the Summit County planning department wrote to the property owners within the Giberson Preserve, notifying them that although the PUD required an HOA, one had never been created and was long overdue.  Despite this notice, the lot owners did not form an association.  In 2015, Chad G. Asarch — another lot owner, defendant-appellee, and cross-appellant — filed articles of incorporation for the "Giberson Preserve Homeowners Association," but the association neither held formal meetings nor recorded any covenants.

¶ 8 Finally, in February 2016, Summit County sent a notice of zoning violation to GLP because no one had yet submitted the required HOA covenants.  The letter said that the county would hold all building permits in abeyance until the lot owners executed and recorded the HOA covenants.  By late 2016, a group consisting

4

of most of the lot owners had drafted and signed a set of covenants (2017 covenants). But Sandri and Ferrari were not part of this group. After the other lot owners submitted the signed covenants to the county, the BOCC held a hearing to approve the covenants and amend the PUD.

¶ 9     Sandri and Ferrari opposed the 2017 covenants on multiple grounds. As relevant to this appeal, they argued that the covenants (1) prevented lot owners from leasing, subleasing, or renting their lot or home for a period of less than six months without HOA approval, effectively restricting the use of the lots for vacation rentals; (2) gave the HOA exclusive architectural control over any permanent improvements to landscaping, sheds, or homes; and (3) allowed the HOA to assess a tap fee and usage fee for water against the various lots. It is uncontested that the 2017 covenants were drafted and recorded after Sandri and Ferrari acquired their lots.

¶ 10    Sandri initiated this lawsuit in March 2019, and the parties have since engaged in protracted litigation and motions practice. The initial defendants included GLP and defendant-appellee and cross-appellant Giberson Preserve Homeowners Association as well

5

as its board members Asarch, Mark Timberlake, and Gary Giberson (collectively, GHOA). In January 2021, after nearly two years of litigation, the court disposed of the parties' cross-motions for partial summary judgment, encompassing part of Sandri's claims, Ferrari's counterclaims and cross-claims, and GHOA's counterclaims and cross-claims. The court held that a common-interest community was not created in 1989.

¶ 11 Based on that holding, and as relevant to this appeal, the trial court resolved the following claims brought by the various parties. For Sandri's and Ferrari's separately brought claims, the court found that (1) their lots were not part of a common-interest community; (2) the Plat and PUD did not constitute a declaration that created a common-interest community; (3) the HOA did not govern their lots; and (4) the 2017 covenants did not encumber their lots. The court also determined that under the application of trust law to the conservation easement, (5) Sandri's guests, invitees, permittees, heirs, successors, and assigns were entitled to use the conservation property for noncommercial recreational purposes, and an amendment to the easement that would have altered their rights was not effective. Additionally, the court denied GHOA's

separate claims that (6) Sandri's and Ferrari's lots are within the HOA and governed by the HOA.

¶ 12     Subsequently, COOL joined the litigation and filed a motion to reconsider the court's application of trust law, instead of property law, to the amendment of the conservation easement.  In March 2021, the trial court reconsidered its summary judgment order, applied both legal frameworks, and reached the same conclusion as it had originally.

¶ 13     Within a week of the order on the motion for reconsideration, and approximately three weeks before the scheduled April bench trial, Sandri's counsel filed an unopposed motion to withdraw, prompting a flurry of urgent motions.  The trial court granted the withdrawal and then continued the bench trial.  The bench trial then took place in multiple parts over the course of approximately a year, beginning in June 2021 and concluding with the trial court's August 2022 "Findings of Fact and Conclusions of Law" (the trial order).

¶ 14     In November 2021, during the pendency of the bench trial, the trial court granted in part and denied in part defendants' C.R.C.P. 41(b)(1) motions, disposing of a portion of Sandri's and Ferrari's

claims. The next day, it denied another homeowner's[2] motion to dismiss for lack of subject matter jurisdiction, which argued that the case could only be brought under C.R.C.P. 106.

¶ 15 Finally, after the court issued the trial order, Sandri interpreted that order as having moved the location of a private access easement road. So he blocked the road. This prompted GHOA to file an emergency motion under C.R.C.P. 60(a) asking the court to correct the trial order to state that it had not moved the road. The trial court granted the Rule 60 motion, and about a month later, the parties appealed.

¶ 16 GLP and GHOA appeal the trial court's grant of summary judgment against them and challenge its subject matter jurisdiction. GLP also appeals the trial court's application of trust law and ruling that the conservation easement was not properly amended. COOL does not take a position regarding the outcome of these issues but challenges the trial court's application of trust law

---

[2] Kathryn Flores filed a C.R.C.P. 41(b)(1) motion to dismiss in the trial court. Flores is another homeowner who was involved in the underlying litigation, but she is not a party to this appeal.

8

to the conservation easement.  Neither Ferrari nor Sandri oppose the relief requested by COOL.

## II.     Improper Incorporation by Reference

¶ 17     Before turning to the merits of this appeal, we first address GLP's use of C.A.R. 28(h) to incorporate GHOA's arguments by reference.  In its opening-answer brief, GLP addresses the issues on appeal in a little over two pages.  Instead of making its own arguments, it purports to "incorporate[] by reference" four of GHOA's arguments from its opening-answer brief "[p]ursuant to C.A.R. 28(h)."  GLP's attempt to incorporate another party's briefing, despite filing its own brief, is improper and represents a misunderstanding of Rule 28(h).

> In cases involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a single brief, and any party may adopt by reference any part of another's brief, but *a party may not both file a separate brief and incorporate by reference the brief of another party*.

C.A.R. 28(h) (emphasis added).

¶ 18     GLP relies on the phrase from Rule 28(h) stating that "any party may adopt by reference any part of another's brief."  But in

doing so, it skips the modifying provision following that phrase, which explicitly prohibits that practice when a party has filed a separate brief.

¶ 19    Other divisions of this court have held that incorporation by reference to briefing in the district court is improper. *People v. Phipps*, 2016 COA 190M, ¶ 11; *Castillo v. Koppes-Conway*, 148 P.3d 289, 291 (Colo. App. 2006). This is partially because attempting to incorporate material by reference "'makes a mockery' of the rules that govern the length of briefs." *Castillo*, 148 P.3d at 291 (quoting *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004)).

¶ 20    That is exactly what GLP's actions do here. GLP was allowed 9,500 words for its opening-answer brief. *See* C.A.R 28.1(g)(1). Its opening-answer brief contains 8,846 words. But the sections of GHOA's briefing that it purports to incorporate by reference constitute approximately 3,000 additional words. This leaves GLP's total word count at just under 12,000 words — more than 2,000 words over the limit permitted by the rules.

¶ 21    GLP's brief does not comply with Rule 28(h) because GLP both filed a separate brief and incorporated by reference the brief of

another party. An "appellate court may dismiss an appeal or other appellate proceeding or impose other sanctions it deems appropriate, including attorney fees, for the failure to comply with any of its orders or these appellate rules." C.A.R. 38(a). We therefore strike the following sections of GLP's opening-answer brief that incorporate by reference: answer sections I.B., II.B., III., and cross-appeal section III.B.

### III. Analysis

¶ 22 GLP and GHOA argue that the trial court erred by (1) concluding that the PUD didn't create a common-interest community and (2) failing to dismiss the case for lack of subject matter jurisdiction. Sandri contends that the trial court erred by (3) granting GHOA's Rule 60 motion[3] and (4) issuing its April 2021 pretrial orders. GLP and COOL also contend that the trial court erred by (5) misapplying the law governing the conservation easement.

¶ 23 We note that the trial court's summary judgment order, Rule 41 order, trial order, and Rule 60 order are thorough, detailed,

---

[3] GHOA brought the Rule 60 motion, which was joined by GLP.

11

and well reasoned. We affirm the trial court's Rule 60 order, but, as a consequence, we reverse that portion of the judgment concerning Sandri's claim against GLP that the 2017 covenants impermissibly expanded the scope of an easement across his property. We affirm the trial court's orders in all other regards.

### A. Whether a Common-Interest Community Was Created by the PUD and Plat in 1989

¶ 24 We first turn to GLP and GHOA's cross-appeal in which they jointly contend that the trial court erred by finding that the PUD and Plat didn't create a common-interest community in 1989. We disagree.

### 1. Applicable Law and Standard of Review

¶ 25 The Colorado legislature enacted CCIOA, sections 38-33.3-101 to -401, C.R.S. 2024, in 1992. This act established a comprehensive statutory scheme for common-interest communities, particularly HOAs. CCIOA automatically applies in its entirety to common-interest communities "created" in the state after its effective date of July 1, 1992. *Accetta v. Brooks Towers Residences Condo. Ass'n*, 2021 COA 87, ¶ 30; § 38-33.3-115, C.R.S. 2024. It generally does not apply to communities created before that date.

*Accetta*, ¶ 30; § 38-33.3-117(3), C.R.S. 2024. CCIOA's provisions containing the necessary prerequisites to properly form a common-interest community are not retroactive. *See* §§ 38-33.3-117, -201, C.R.S. 2024.

¶ 26 We review summary judgment orders de novo, "recognizing that summary judgment is appropriate only where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law." *Beeftu v. Creekside Ventures LLC*, 37 P.3d 526, 528 (Colo. App. 2001). We also review de novo the interpretation of a written document as a question of law. *GMAC Mortg. Corp. v. PWI Grp.*, 155 P.3d 556, 557 (Colo. App. 2006).

### 2. The PUD and Plat Did Not Create a Common-Interest Community

¶ 27 GLP and GHOA argue that the PUD and Plat created a common-interest community in 1989, years before CCIOA went into effect. The PUD set forth a water system, access roads, and maintenance responsibilities. It explicitly said that "a homeowners association" would be responsible for necessary maintenance. The PUD also envisioned the later filing of HOA covenants prior to final approval of the PUD, which would, among other things, "delineate

13

the responsibilities for the maintenance of roads." However, Giberson never recorded the anticipated HOA covenants, and Summit County approved and recorded the PUD and the final Plat without receiving them.

¶ 28    The trial court analyzed this issue under both the common law and CCIOA but rightly recognized that CCIOA was not controlling. On appeal, all parties agree that CCIOA does not control the creation of a common-interest community here.

¶ 29    The parties do not cite, nor are we aware of, any controlling case law that explicitly sets forth the standard for creating a common law common-interest community. However, as the trial court noted, section 6 of the Restatement (Third) of Property: Servitudes provides a useful and persuasive overview of the general common law principles applicable to common-interest communities.

¶ 30    The Restatement defines a common-interest community as

> a real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal
>
> (a) to pay for the use of, or contribute to the maintenance of, property held or enjoyed in common by the individual owners, or

(b) to pay dues or assessments to an association that provides services or facilities to the common property or to the individually owned property, or that enforces other servitudes burdening the property in the development or neighborhood.

*Id.* § 6.2.

¶ 31 The Colorado Supreme Court has found the Restatement persuasive in analyzing similar common-interest community issues, *see Evergreen Highlands*, 73 P.3d at 8, albeit in the context of CCIOA communities. We do the same here. We hold that — as described by the Restatement's definition — a pre-CCIOA common-interest community exists when (1) individual properties are (2) properly burdened with a servitude that imposes an obligation to either (a) pay for the use of or contribute to the maintenance of commonly held or enjoyed property or (b) pay dues or assessments to an association that provides a service or enforces a servitude on commonly held or enjoyed property.

¶ 32 This test aligns with other related principles described by the Restatement. *See* Restatement (Third) of Prop.: Servitudes § 6.1 cmt. a ("Common-interest communities are usually created by a declaration of servitudes that, at a minimum, imposes use

restrictions and assessment obligations and provides for creation of an association."); Restatement (Third) of Prop.: Servitudes § 6.5 cmt. a ("By definition, a common-interest community covered by this Chapter is one in which the individual properties are burdened by a servitude requiring that the property owner either contribute to the support of common property or pay dues or assessments to a property-owners association.").[4]

¶ 33    Having established a test to determine whether documents create a pre-CCIOA common-interest community, we now apply it to the issue before us.

¶ 34    The PUD satisfied the first factor of the test by subdividing the original land into individual properties. The PUD created thirteen residential lots, a road tract, and three agricultural or open spaces. However, it fails to satisfy the second factor. By its plain language, the PUD does not burden the lots with a servitude that imposes an

---

[4] This test also aligns with the supreme court's test to determine what documentation is necessary to create a common-interest community under CCIOA. *See Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 44 ("[F]or one or more documents to create a common-interest community (and hence amount to a declaration), they must, at a minimum, (1) establish an obligation to pay for various expenses associated with common property and (2) attach that obligation to individually owned property.").

obligation to either pay for or maintain commonly held or enjoyed property or to pay assessments to an HOA.

¶ 35 It's true that the PUD defines some services that will be provided to the thirteen residential lots, such as water and a private road. And it goes as far as stating that an HOA will provide the water services and road maintenance in the future.

¶ 36 It's also true that the PUD envisioned the eventual creation of that HOA. The PUD stated that "[Giberson] must submit covenants for the homeowners association for review by the County. The covenants shall delineate the responsibilities for the maintenance of roads, sewer systems, water systems, and landscaping in common areas as an obligation of the homeowners association." But it's clear from the record in this case that Giberson never completed the key step of timely submitting and recording HOA covenants, though the record doesn't reveal the reason for that omission. Regardless, the PUD is missing a key feature required by the second factor: It does not explicitly provide any means for an assessment against the lots or require that the property owners contribute to the support of common property.

¶ 37     GHOA and GLP ask us to look beyond the plain language of the PUD and conclude that the obligation to pay assessments is implied, and therefore, a common-interest community was also created by implication.  We decline the invitation.

¶ 38     GHOA and GLP argue that *Evergreen Highlands* controls this matter and that an implied obligation must exist to avoid placing the HOA "in the untenable position of being obligated to maintain facilities and infrastructure without any viable economic means by which to do so."  73 P.3d at 4.  However, as the trial court rightly noted, *Evergreen Highlands* is factually distinguishable from the matter before us.

¶ 39     In that case, the supreme court noted that "[a]t the time [the homeowner] purchased his lot in 1986, the [HOA] declarations made clear that a homeowners association existed, it owned and maintained the park area, and it had the power to impose annual membership or use fees on lot owners."  *Id.* at 9.  The supreme court found that these facts were sufficient to create a common-interest community within the meaning of CCIOA by implication.  In reaching this conclusion, the court quoted the Restatement:

> An implied obligation may . . . be found where the declaration expressly creates an association for the purpose of managing common property or enforcing use restrictions and design controls, but fails to include a mechanism for providing the funds necessary to carry out its functions.  When such an implied obligation is established, the lots are a common-interest community within the meaning of this Chapter.

*Id.* (quoting Restatement (Third) of Prop.: Servitudes § 6.2 cmt. a).

¶ 40    In *Evergreen Highlands*, then, the supreme court answered two questions.  First, it decided whether common-interest communities have the implied power to levy assessments for maintaining common property.  Then it decided whether the explicitly created pre-CCIOA HOA had sufficient features from which the court could consider the subdivision an implied common-interest community under CCIOA.  GHOA's argument collapses the reasoning from these two questions.  The *Evergreen Highlands* court didn't conclude that the subdivision was a common-interest community because the HOA had a need to levy assessments.  The court concluded that the HOA could levy assessments because the subdivision *already* met the definition of a

19

common-interest community, and common-interest communities have the power to levy assessments.

¶ 41    But here, no such HOA or common-interest community existed when Ferrari or Sandri purchased their lots.  And while we "must construe covenants as a whole based upon their underlying purpose, [we] will enforce a covenant as written if clear on its face." *Evergreen Highlands*, 73 P.3d at 3.  "Ambiguities will be resolved in favor of the free and unrestricted use of property." *Id.*  Applying those principles here, we see no such indication of a pre-existing HOA.  While the PUD envisioned one, no HOA had been created, no covenants had been recorded, and no association had been maintaining the common areas.

¶ 42    GLP and GHOA also rely on *DeJean v. Grosz*, 2015 COA 74, ¶ 30, in which another division of this court analyzed a similar issue, though guided by CCIOA instead of the common law.  In that case, a declaration notified potential purchasers that they were automatically members of an HOA.  The division concluded that the HOA could "be formed, even after a delay, by another homeowner." *Id.*  But unlike the matter before us, the covenants in *DeJean* "subject[ed] the owners of both units to automatic membership in

the [HOA] [and were] intended to run with the land." *Id.* at ¶ 36. The division therefore concluded that "the DeJeans had notice and consented to be members of the [HOA] when they acquired title" to their property. *Id.*

¶ 43 Here, neither Sandri nor Ferrari took title to the land with notice that they would automatically be members of a common-interest community. To the contrary, the trial court found that Ferrari — the first person to build a residence on the lots — conducted extensive due diligence, discovered the PUD, and believed that his lot was not within a common-interest community. The trial court also found that, in fact, the PUD didn't describe in any manner which lots would be members of any HOA or how such an HOA would be funded.

¶ 44 While *Evergreen Highlands* and *DeJean* inform our analysis, the matter before us is the most similar to the facts in *McMullin v. Hauer*, 2018 CO 57. There, a land dispute concerned the ownership of seventeen acres of "common open space" in a purported common-interest community. *Id.* at ¶ 1. Two developers recorded a final plat intending to develop a rural subdivision. *Id.*

21

¶ 45    "[T]he recorded final plat included a map of the seventeen acres of common open space, and notices on the final plat provided that a 'private access road,' domestic wells to service the subdivision, and 'common ownership and maintenance' would be the responsibility of the 'Home Owner's Association.'" *Id.* at ¶ 5. The final plat also stated that covenants accompanying the subdivision "are filed in the office of the Rio Blanco County Clerk and Recorder in Book __ Page __." *Id.* However, no such covenants were filed. *Id.* Seven of the lots were sold to three different parties, and subsequently, those lot owners sued to quiet title to the properties and the open space. *Id.*

¶ 46    The *McMullin* court determined that under CCIOA, "these documents, even taken together, do not expressly obligate the lot owners to pay for expenses associated with the common property, let alone attach that obligation to individually owned property." *Id.* at ¶ 20. The court went on to draw a clear distinction between the case before it and the facts of *Evergreen Highlands*: "[Q]uite unlike the situation in this case, the declarations in *Evergreen Highlands* 'made clear that a homeowners association existed, it owned and maintained the park area, and it had the power to impose annual

22

membership or use fees on lot owners.'" *McMullin*, ¶ 23 (quoting

*Evergreen Highlands*, 73 P.3d at 9). The court determined that this

sharp contrast showed why the policy concerns necessitating an

assessment obligation by implication in *Evergreen Highlands* were

not present in *McMullin*. *Id.* at ¶ 24.

¶ 47    The court then held that

> the recorded plat, the deeds, and the
> subdivision agreement, taken together, do not
> amount to a declaration sufficient under
> CCIOA to establish a common-interest
> community. Collectively, these documents do
> not obligate homeowners to pay expenses
> related to commonly owned space, do not
> expressly create a homeowners' association,
> and lack too many statutorily prescribed
> components. Moreover, the primary concern
> animating our decision in *Evergreen
> Highlands* — i.e., saving a homeowners'
> association from the "untenable position of
> being obligated to maintain facilities and
> infrastructure without any viable economic
> means by which to do so" — is not present
> here.

*McMullin*, ¶ 29 (quoting *Evergreen Highlands*, 73 P.3d at 4).

¶ 48    It's true that *McMullin* was decided under CCIOA. But the

legal principles animating it are similar to, if not the same as, those

underlying the common law. And it wrestled with nearly identical

facts. Here, the recorded PUD and Plat included a map outlining

23

common-ownership space and described road maintenance, the water and sewer system, and common area landscaping as the responsibility of an HOA. *See id.* at ¶ 19. And while HOA covenants were envisioned, they were never recorded.

¶ 49     Additionally, the supreme court addressed the underlying policy concerns that motivated the implied assessment obligation in *Evergreen Highlands*. *See McMullin*, ¶ 24. Compared to *McMullin*, there was an existing HOA in *Evergreen Highlands* that owned and maintained the park area and had the power to impose annual membership or use fees. *See id.* at ¶ 23. However, "[b]y contrast, the recorded documents [in *McMullin*] did not expressly create a homeowners' association." *Id.* at ¶ 25.

¶ 50     This lack of an existing HOA is a key distinction between *Evergreen Highlands* and this case. And like *McMullin* indicates, "the primary concern animating [the] decision in *Evergreen Highlands* — i.e., saving [an existing] homeowners' association from the 'untenable position of being obligated to maintain facilities and infrastructure without any viable economic means by which to do so' — is not present here." *McMullin*, ¶ 29.

¶ 51    Accordingly, *McMullin* guides and reinforces our determination that, taken together, the recorded PUD and Plat do not expressly obligate the lot owners to pay for the use of or contribute to the maintenance of commonly held or enjoyed property or to pay dues or assessments to an association that provides a service or enforces a servitude on commonly held or enjoyed property.

¶ 52    Further, the PUD and Plat do not create an assessment by implication.  The documents did not create an HOA (and consequently there isn't a pre-existing association that would otherwise lie bereft of the ability to maintain the common areas, despite its obligations to do so).

¶ 53    Thus, the trial court did not err by concluding that the PUD and Plat did not create a common-interest community and, therefore, that the 2017 covenants are not binding on Sandri and Ferrari.

25

B.  Subject Matter Jurisdiction

¶ 54    GHOA also challenges the trial court's decision for lack of subject matter jurisdiction.[5]  It argues that the BOCC's hearing and approval of a minor amendment to the PUD was a quasi-judicial decision that required the lot owners to challenge encumbrances on their lots through an action under C.R.C.P. 106(a)(4) brought within twenty-eight days of the BOCC's decision.  We disagree.

1.  Standard of Review

¶ 55    Rule 106(a)(4) "provides for review of quasi-judicial decisions made by a governmental body or officer in a civil matter where the law otherwise provides no plain, speedy, and adequate remedy." *Brown v. Walker Com., Inc.*, 2022 CO 57, ¶ 1.  Rule 106(a)(4) is the exclusive remedy for reviewing quasi-judicial decisions.  *JJR 1, LLC v. Mt. Crested Butte*, 160 P.3d 365, 369 (Colo. App. 2007).

¶ 56    The review contemplated by this rule is narrow: "Courts simply review the lower body or officer's decision to determine

---

[5] In its briefing, GHOA asserts that the trial court erred by denying Flores's Rule 41(b)(1) motion to dismiss.  GHOA did not join in Flores's motion below, so that motion does not preserve the argument for GHOA on appeal.  But because a party can challenge the court's subject matter jurisdiction at any time, *Brooks v. Raemisch*, 2016 COA 32, ¶ 10, we review the issue regardless.

whether it 'has exceeded its jurisdiction or abused its discretion . . . .'" *Walker Com.*, ¶ 27 (quoting C.R.C.P. 106(a)(4)). A Rule 106(a)(4) complaint must be filed within twenty-eight days of the governmental body or officer's final decision. C.R.C.P. 106(b).

¶ 57 A court's lack of subject matter jurisdiction may not be waived and can be raised at any time in a proceeding. *Brooks v. Raemisch*, 2016 COA 32, ¶ 10. We review the court's determination whether it has subject matter jurisdiction de novo. *See City of Boulder v. Pub. Serv. Co. of Colo.*, 2018 CO 59, ¶ 14. Similarly, we review de novo the court's determination whether a plaintiff's complaint sought review of a governmental body's quasi-judicial functions or its quasi-legislative actions. *Farmers Water Dev. Co. v. Colo. Water Conservation Bd.*, 2015 CO 21, ¶ 14.

2. Rule 106(a)(4) Doesn't Govern This Dispute

¶ 58 GHOA argues that the trial court lacked subject matter jurisdiction because Rule 106(a)(4) provided the exclusive remedy for the lot owners to challenge the encumbrance of their lots.

¶ 59 On August 8, 2017, the BOCC approved a minor amendment to the PUD. The amendment dealt only with a single provision, section B.5, "Maintenance Responsibilities." It amended that

27

provision to include, in major part, language to reflect that "the County *has reviewed and approved* the . . . covenants [of the HOA] . . . delineating maintenance responsibilities," instead of the previous language, which stated that "the County *shall approve* the provisions of the covenants concerning maintenance responsibilities." (Emphasis added.)

¶ 60     The trial court found that the BOCC's decision was not quasi-judicial and, therefore, that the court had jurisdiction because "the only action the BOCC took on August 8, 2017, was to approve a very minor modification of [section B.5] of the Original 1989 Plat." The court noted that there was no evidence that the BOCC had deliberated about the covenants as a whole, taken evidence, made findings on the record, or done anything other than indicate that the minor amendment satisfied the outstanding requirement of the PUD.

¶ 61     Most importantly, the court concluded that the BOCC's approval of the amendment did not determine the covenants' validity, delineate the rights of the parties to this appeal, or resolve the enforceability of the 2017 covenants on the lots at issue. To the contrary, the record shows that the BOCC was aware of the ongoing

28

dispute between GLP and Sandri and Ferrari; it explicitly said that enforcement of the 2017 covenants "will be a private matter to be decided amongst the lot owners."

¶ 62     We agree with the trial court's conclusion.  In reviewing this matter, "our inquiry must focus on the nature of the governmental decision and the process by which that decision is reached." *Widder v. Durango Sch. Dist. No. 9-R*, 85 P.3d 518, 527 (Colo. 2004). And "'[q]uasi-judicial' decision making, as its name connotes, bears similarities to the adjudicatory function performed by courts." *Id.* The question before the BOCC was an entirely separate matter from the dispute between the parties to determine the enforceability of the covenants in this litigation, and the minor amendment bore no similarity to a court proceeding to determine the rights of the parties.  Thus, the amendment was not quasi-judicial.  And even if consideration of the amendment were quasi-judicial, that wouldn't have brought the completely separate issues involved in this litigation under the purview of Rule 106(a)(4).

¶ 63     We discern no error in the trial court denying the motion to dismiss for lack of subject matter jurisdiction.

## C.    The Rule 60 Order

¶ 64    Sandri contends that the trial court erred by granting GHOA's Rule 60 motion.  We disagree.  However, we do agree with an underlying aspect of Sandri's argument.  The factual and legal determinations of GLP's and Sandri's respective rights as to an easement across one of Sandri's lots are erroneous and require reversal.  We first address the Rule 60 order and the location of the easement before turning to its exclusivity.

### 1.    Applicable Law and Standard of Review

¶ 65    "Clerical mistakes in judgments, orders, or other parts of the record[, including] errors . . . arising from oversight or omission, may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders."  C.R.C.P. 60(a).  We review a trial court's decision concerning the correction of clerical errors under Rule 60(a) for an abuse of discretion.  *Reisbeck, LLC v. Levis*, 2014 COA 167, ¶ 7.  A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.  *Id.*

¶ 66 "When a court enters a judgment following a bench trial, that judgment presents a mixed question of law and fact." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12. We apply a mixed standard of review to such questions. We review the trial court's legal conclusions, including its application of the governing legal standards, de novo, and we will not disturb its factual findings unless they are clearly erroneous and not supported by the record. *See Jehly v. Brown*, 2014 COA 39, ¶ 8. If the evidence is conflicting, we may not substitute our own conclusions for those of the trial court merely because there may be credible evidence supporting a different result. *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008).

## 2. Additional Background

¶ 67 At the center of this issue is the location of the private access easement serving Lots 7, 8, 9, and 10 (the PAE)[6] as well as Sandri's

---

[6] We note that under the PUD and Plat, there are two private access easements. The one running to Lots 11, 12, and 13 is not at issue on appeal. Thus, any reference to PAE solely encompasses the private access easement running to Lots 7, 8, 9, and 10.

and GLP's respective rights under the easement and their ability to control access to the PAE.

¶ 68 The PUD and Plat set forth the location of three roads within the Gibson Preserve, one of which is the PAE. Sandri raised two claims in relation to the PAE. First, Sandri argued that GLP impermissibly expanded the geographic footprint of the PAE, doubling its original width, when the road was graded and slightly relocated. Second, Sandri argued that GLP, through the 2017 covenants, impermissibly expanded the scope of the easement.

¶ 69 We also note that prior to or at the bench trial, no party claimed, nor does the record contain any indication, that the PAE was moved from its historical location as depicted in the PUD and Plat to another area within the development.

### 3. The Rule 60 Order Was Not in Error

¶ 70 After conducting the bench trial, the trial court rejected Sandri's first claim and found that the PAE's width was not expanded beyond twenty feet. The trial court then addressed the second claim about the exclusivity of the PAE. In doing so, it provided "a crude sketch of the property in question" and "added its own markings showing the approximate location of pertinent

landmarks and easements." One of these markings was a green line that ran from the end of Giberson Road across the top of Lots 7, 8, 9, and 10. The trial court's sketch is below, labeled as Figure 1.



*Figure 1*

¶ 71     Figure 1 was the foundation of the Rule 60 motion. After Sandri interpreted the green line as relocating the PAE and blocked the road, GHOA filed its Rule 60 motion.

¶ 72     That motion argued that the court had mistakenly labeled the PAE on the map: Instead of running down between Lots 8 and 9 before passing through Lot 9, the green line showed the PAE as

running continually along top of the lots to the border of Tract C.[7]

The trial court agreed, granted the motion, and clarified that it did

not intend to move the location of the PAE.

> The Court now realizes the Court's green line,
> intended to depict the approximate location of
> the "Private Access Easement (serving lots 7, 8,
> 9, 10)" is not in the correct location at Lots 9
> and 10.  Instead, the Court's green line
> traversing across the tops of Lots 9 and 10
> now has the PAE going through the
> Conservation Easement Tract C property;
> when in reality . . . the PAE traverses
> downward between the borders of Lots 8 and
> 9, before running horizontally near the bottom
> of Lot 9 where it ends at Lot 10.
>
> The Court wholly rejects [Sandri's] argument
> that [the trial order] determined that the PAE
> had been relocated and the diagram in
> question supports that finding.
>
> The Court re-iterates that the location of the
> PAE is precisely where it is depicted in the
> Plat, PUD and Declaration.

The Plat contains a map of the PAE, as referred to in the court's

trial order.  A portion of that map, labeled as Figure 2, appears

below.[8]

---

[7] Tract C consists of the private open space as depicted in Figure 1
above and Figure 2 below.

[8] For clarity we have added a label for "Tract C" to Figure 2.



*Figure 2*

¶ 73     Figure 2 clearly shows that the PAE runs across the border between Lots 7 and 8 and Tract C, before turning down the borders of Lots 8 and 9 and crossing the bottom of Lot 9 to reach Lot 10. This map directly supports the trial court's description of where the PAE is located in its Rule 60 order and supports its finding that the PAE was not moved outside of Lot 9.

¶ 74     Nonetheless, Sandri argues — without any supporting citation to the record — that "[t]he Trial Order repeatedly said that the PAE *no longer crossed Lot 9* and was *wholly located on Tract C,* immediately north of Lot 9, but still providing access to Lot 10." (Emphasis added.)  We see no such language in the trial order.  In

35

fact, the trial order does not say that the PAE was relocated in any fashion.[9]

¶ 75     Moreover, the trial court was clear in its Rule 60 order that it had not intended to move the PAE and that the PAE was not moved from its approximate historical location depicted in Figure 2.  As the trial court explicitly ruled, "[I]ts depiction of the PAE . . . in the [trial order][10] was merely a demonstrative depiction and was not intended by the Court to re-draw the actual location of the PAE where it traverses through Lots 9 and 10."

¶ 76     "Appellate courts generally defer to a lower court's construction of its own rulings." *People in Interest of J.C.*, 2018 COA 22, ¶ 31.  We give that deference to the trial court's ruling that it did not move the PAE.  Moreover, the record supports this ruling.  Comparing the highlighted map in the trial order with the map in

---

[9] We note that the trial order does reference the PAE being moved, but the references are to the alleged increase in the PAE's width and in the context of Sandri's claim that the PAE was enlarged.  Sandri does not claim that this is the language that supports his contention.

[10] Represented in Figure 1 in this opinion.

the Plat, it is clear that the trial court simply made a mistake and drew a portion of the green line in the wrong place.

¶ 77    Rule 60(a) "functions as a safety valve and allows the district court to correct, at any time, an honestly mistaken judgment that does not represent the understanding and expectations of the court and the parties." *Levis*, ¶ 8.  We discern no error in the trial court's use of this rule to correct the improperly labeled diagram in its trial order.

4.    The Underlying Findings of Fact and
Conclusions of Law Are in Error

¶ 78    Sandri also argues that the trial court's diagram was not the only basis for concluding that the PAE was moved and that other substantive parts of the judgment demonstrate that conclusion. Sandri asserts that references to GLP holding the servient estate and the lot owners holding the dominant estate show that either the trial court meant to move the PAE or that it introduced a substantive error into its order that should have been remedied under C.R.C.P. 59, not Rule 60.  We agree with Sandri that some of the language within the corrected trial order isn't consistent with some of the trial court's findings regarding one of Sandri's claims.

¶ 79     After trial, the trial order resolved "all remaining portions of

Sandri's [C.R.C.P.] 105 claim."  Specifically, Sandri had argued that

the 2017 covenants impermissibly expanded the scope of the PAE to

provide access not only to Lots 7 through 10 but also to the open

space.  In resolving that claim, the trial court included the following

in the trial order:

- "To reiterate, the Court now concludes that [GLP] owns

  the title to the land upon which the [PAE] sit[s]."

- "[GLP] can grant additional easement rights across its

  own property."

- "As the servient estate holder, [GLP] may make any use of

  its own land."

- "As of the date of trial, [GLP] continues to be the record

  owner of the servient estate upon which the [PAE] sit[s].

  Thus, as it stands and with regard to the [PAE], [GLP]

  (and not [Giberson]) owns the servient estate and the lot

  owners . . . hold the dominant estates."

- "As the servient estate holder, [GLP] is most certainly

  permitted to make any use of [its] property that [it] see[s]

fit, including granting other easements and access rights."

- "[B]ecause the [PAE] is not an 'exclusive' easement, [GLP], as the servient estate holder, may continue to utilize its property just as any property owner may do subject to the restriction that it may not unreasonably interfere with the already established easement rights of the dominant estate holders."

¶ 80    These statements are only true for the portion of the PAE that runs across Tract C, approximately one quarter of its total area, as depicted in Figure 2.  This portion of the PAE is located on Tract C along the border of Lots 7 and 8.  Thus, the trial court is correct that, as to the portion of the PAE running across Tract C, GLP holds the servient estate, while the lot owners — who use the easement to access their land — hold the dominant estate.

¶ 81    However, as to the rest of the PAE — specifically the portions depicted as running across Lots 7, 8, and 9 — the underlying lot owners own the land, not GLP.  Figure 3, below, contains highlighting that shows the portion of the PAE that runs exclusively over Sandri's Lot 9.



*Figure 3*

¶ 82     The court's trial order does not make a distinction between

these separate property interests within the PAE.

> Where, as here, an easement is not exclusive, both the owner of the dominant estate and the owner of the servient estate have a right to use the property. Therefore, the parties' interests must be balanced. The owner of the servient estate has a "qualified right to put his or her property to any lawful use for which it may be adapted" but "cannot unreasonably interfere with the superior right of the person possessing the easement." By contrast, the owner of the dominant estate may use the easement in any manner "reasonably necessary to permit [its] full use," but cannot unreasonably interfere with the enjoyment of the servient estate.

*Amada Fam. Ltd. P'ship v. Pomeroy*, 2021 COA 73, ¶ 67 (quoting

*Lazy Dog Ranch v. Telluray Ranch Corp.*, 923 P.2d 313, 317 (Colo.

App. 1996)).

¶ 83     As the trial court's Rule 60 order correctly states, the PAE —

as depicted in Figure 3 — runs across Sandri's Lot 9.  But as to this

lot, no portion of the PAE is on land owned by GLP.  Thus, contrary

to the trial order, Sandri's land is burdened by the PAE, rendering

Lot 9 the servient estate.  *See Salazar v. Terry*, 911 P.2d 1086,

1090-91 (Colo. 1996) ("The burdened estate is servient to the

dominant estate which benefits from the easement.").

¶ 84     Therefore, the trial court's conclusion that GLP holds title to

the land underlying the PAE and is the servient estate — beyond

the portion that runs across GLP's Tract C — is not supported by

the record or the court's conclusion in its Rule 60 order.  Thus, that

conclusion also cannot support its judgment in favor of GLP.  There

is an obvious conflict between the trial court's Rule 60 order, which

reiterates where the PAE lies, and the underlying trial order's

delineation of property rights.  And when a trial court's orders

conflict, we may remand for the court to resolve the issue.  *See*

*Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916,

926 (Colo. 1993) (determining that two trial court orders conflicted

and remanding for further proceeding necessary to resolve the

conflict).

¶ 85    We therefore reverse and remand this claim to the trial court for further findings of fact and conclusions of law as to the portion of Sandri's quiet title claim under C.R.C.P. 105 against GLP alleging that GLP inappropriately expanded the PAE access on Lot 9.

### D. The Orders Regarding Attorney Withdrawal and Pretrial Motions

¶ 86    Sandri next contends that the trial court erred when it issued several orders in April 2021 that (1) allowed Sandri's counsel to withdraw early and (2) addressed various pretrial motions. The first issue is unpreserved, and we disagree with the second.

### 1. Preservation

¶ 87    GLP and GHOA argue that Sandri failed to preserve his argument that the trial court erred by allowing his counsel to withdraw because Sandri didn't object to the withdrawal before the fact. In response, Sandri contends that he preserved this issue in his motion for a continuance, filed after the withdrawal. In it, Sandri argued that the trial court abused its discretion by shortening the fourteen-day timeframe provided in C.R.C.P. 121, section 1-1(2)(c). We are not persuaded and conclude that Sandri failed to timely preserve this issue.

## 2. Additional Facts and Analysis

¶ 88    On March 23, 2021, Sandri's prior counsel moved to withdraw, citing irreconcilable differences. That same day, Sandri filed a pro se request for a continuance to obtain new counsel, in which he lambasted his counsel's decision-making and handling of the case.[11] The trial court shortened the deadlines to respond to both the withdrawal and continuance until March 30. The trial court conducted a hearing on March 31 and granted the motion to withdraw on April 3, three days earlier than the fourteen-day-objection deadline under Rule 121, section 1-1(2)(c). The trial court also denied Sandri's pro se continuance motion, saying that it "d[id] not find good cause to continue trial" because Sandri "made the decision to fire [his] attorneys primarily due to this potential conflict, despite the fact trial [was] a mere three weeks away." However, roughly two weeks later, the court relented and granted Sandri's new counsel a two-month continuance.

---

[11] Sandri's motion also contained his email communications with counsel demonstrating extensive disagreements regarding damages and highlighting his counsel's belief that his damages request lacked the documentation to support his claims. The refusal or inability to provide documentary support for his damages appears to be a key reason for Sandri's split with his former counsel.

43

¶ 89    It's undisputed that Sandri didn't object to his counsel's withdrawal by the deadline set by the court (or even by the fourteen-day deadline under the rules).  To the contrary, in this timeframe he expressed his deep dissatisfaction with his prior counsel and referred to them as "my former attorneys."  On this point, after the March 31 hearing, the trial court found that Sandri had "fired" his attorneys.[12]

¶ 90    It's true that Sandri objected after-the-fact in his second continuance motion, arguing that the court erred by reducing the rule's fourteen-day timeframe to eleven days.  But by the time he objected, the court had already permitted the withdrawal, and he was represented by new counsel.

---

[12] This situation is similar to the facts that a division of this court encountered in *Federal Land Bank of Wichita v. B.A.V., Inc.*, 809 P.2d 1110, 1111 (Colo. App. 1991), where the "defendants invited the court's actions in permitting their attorney to withdraw."  The B.A.V. defendants did not object to their attorney's withdrawal and claimed that they were dissatisfied with their attorney's services.  *Id.* at 1112.  Because of this, the division concluded that the "defendants [could ]not, on appeal, successfully assert that the trial court abused its discretion in permitting the attorney to withdraw."  *Id.*

¶ 91    By failing to timely object to the motion to withdraw, Sandri

failed to preserve this issue.[13]  *See Ortiz v. Progressive Direct Ins.*

*Co.*, 2024 COA 54, ¶ 39 (determining an issue unpreserved when a

party failed to timely raise the issue to the trial court).  And though

he was pro se, he was still obligated to adhere to the rules of

procedure applicable to attorneys, *see Yadon v. Southward*, 64 P.3d

909, 912 (Colo. App. 2002), and the court could not act as an

advocate on his behalf, *see Johnson v. McGrath*, 2024 COA 5, ¶ 10.

¶ 92    In civil cases, we generally do not review issues that are

insufficiently preserved.  *Ortiz*, ¶ 40.  Thus, we decline to address

this issue further.

¶ 93    However, Sandri's contention that the trial court erred in its

disposition of other pretrial motions is preserved for review, and we

address it below.

---

[13] Even if Sandri had preserved this issue, there is no indication
that he was prejudiced or that his former counsel abandoned his
case prior to the court's discovery deadline.  The record
demonstrates that, despite irreconcilable differences, former
counsel was engaged in motions practice until March 30, 2021, the
day before the trial court's deadline.

### 3. The April 2021 Orders Were Not an Abuse of Discretion

¶ 94    Sandri contends that the trial court abused its discretion through the combined effect of its April 2021 orders. He argues that he faced "extreme prejudice" from "the sum of the [Trial] Court's Orders in April 2021" and that these orders prevented him from receiving a fair trial. We review a trial court's rulings on discovery issues for an abuse of discretion. *Gateway Logistics, Inc. v. Smay*, 2013 CO 25, ¶ 13.

¶ 95    It appears from the record that the trial court issued at least fifteen orders in April 2021, ranging from granting telephonic testimony to denying a C.R.C.P. 41 motion to dismiss Sandri's claims.[14] Of these fifteen orders, Sandri presents an argument on two, the aforementioned withdrawal order and the court's "Order

---

[14] Though Sandri generically challenges the April 2021 orders, we presume he does not intend to challenge the trial court's order refusing to dismiss his claims.

Granting Plaintiffs' Emergency Motion to Continue with
[C]onditions."[15]

¶ 96    The order granting the emergency motion to continue noted
that "all pre-trial deadlines and orders remain in effect." In
addition, the trial court ordered that, "discovery is closed, no new
experts may be disclosed, and no new damages or claims may be
asserted."

¶ 97    The background to the discovery cutoff dispute is that Sandri
had added $6.3 million in claimed damages through a C.R.C.P.
26(a)(1)(C) disclosure on January 28, 2021. However, he lacked
supporting documentation for these damages, and the trial court
ordered him to disclose and meet his discovery obligations by
March 15, 2021. When he failed to do so, the trial court struck the
$6.3 million subset of his claimed damages.

¶ 98    Sandri seems to argue that he lost out on the ability to present
evidence of these damages. But the record doesn't support this

---

[15] We only consider these two orders because although Sandri refers generally to "the April 2021 orders," he presents no argument as to how any other orders caused or contributed to his asserted prejudice. And "[w]e don't consider undeveloped and unsupported arguments." *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12, *aff'd*, 2021 CO 56.

argument.  It's true that the trial court originally struck eight of Sandri's nine damages categories.[16]  But then Sandri filed a motion to reconsider in which he disclaimed $3,945,350.30 of the previously requested damages.  The trial court granted his motion and found that Sandri disclosed sufficient documents to support a claim on four of the eight previously stricken damages categories.

¶ 99    Regardless, "[a] court has discretion to impose a reasonable discovery deadline in managing its docket." *Leaf v. Beihoffer*, 2014 COA 117, ¶ 47.  We see no abuse of discretion in these rulings.

¶ 100    Additionally, even if we did see any abuse of discretion in the rulings, any resulting error is harmless as a matter of law.  The trial court ultimately found after trial that Sandri failed to prove any of the essential elements of the claim underlying his damages.  *See id.* at ¶ 12 ("If a plaintiff fails to establish any one of [a tort's] elements, any errors related to other elements are necessarily harmless because the plaintiff cannot prevail in any event."); *Schlesselman v. Gouge*, 431 P.2d 35, 37 (Colo. 1967) (refusing to consider

---

[16] At that point, the case was over two years old, and Sandri had already waited eighteen months before disclosing over $6.3 million in new, unsupported damages.

contentions of error related to damages where the jury returned a verdict in favor of the defendant on "the basic issue of liability"). Because Sandri didn't prevail on his underlying claim — and fails to challenge that loss on appeal — his professed inability to seek any portions of his damages is necessarily harmless.

¶ 101 The remainder of Sandri's contentions consists of complaints over the way his former counsel handled the case. For example, he argues that his former counsel should have added different claims. But as the trial court noted, at that point it was too late for Sandri to "reimagine his case after two years of pre-trial litigation," and he had already amended his complaint twice. Regardless, none of Sandri's complaints about his former counsel demonstrate an abuse of discretion by the trial court. Sandri and his former counsel shaped the litigation. We see no indication that the trial court did anything other than appropriately manage an unwieldy case.

¶ 102 Thus, we discern no error in the trial court's grant of the continuance with conditions.

## E. The Conservation Easement Amendment

¶ 103 We now turn to GLP's contention that the trial court erred in its interpretation of the conservation easement.[17] We disagree.

### 1. Additional Background and Procedural History

¶ 104 In mid-2018, GLP amended the conservation easement, changing the provisions governing the rights conveyed and reserved. Sandri and Ferrari objected, claiming that the change — in violation of the conservation easement's amendment provision — reduced their access to the private recreation area from a right to a mere privilege, revocable at GLP's discretion.

¶ 105 The trial court initially analyzed this issue during the summary judgment proceedings and, applying trust law, found that the amendment was improper. Soon after, COOL joined the ongoing litigation and filed a motion to reconsider, arguing that property law controls this issue. After reviewing the matter, the trial court issued its reconsideration order, applied both trust and

---

[17] From its briefing, it is unclear if GLP also intended to separately argue that the trial court reversibly erred in ruling that Ferrari has a right to use a trail within the conservation easement. To the extent that this is a separate issue, GLP develops no argument on this point, so we decline to consider it separately further. *See Woodbridge*, ¶ 41 n.12.

property law to the conservation easement, and came to the same conclusion as it had in its summary judgment order.

¶ 106    On appeal, GLP challenges the trial court's conclusions and, alongside COOL, argues that property law, not trust law, applies to this issue.

### 2.    Standard of Review and Applicable Law

¶ 107    We review the court's judgment after a bench trial as a mixed question of law and fact. *State Farm Mut. Auto. Ins.*, ¶ 12. We review the trial court's legal conclusions de novo and its factual findings for clear error. *See Jehly*, ¶ 8. The interpretation of a written document also presents a question of law that we review de novo. *GMAC Mortg.*, 155 P.3d at 557.

¶ 108    A conservation easement in gross shall not be deemed personal in nature and shall constitute an interest in real property notwithstanding that it may be negative in character. § 38-30.5-103(2), C.R.S. 2024. The extent of an expressly created easement, including the limits of its authorized use, is determined by interpreting the conveyance instrument. *Lazy Dog*, 965 P.2d at 1235; *see also* Restatement (Third) of Prop.: Servitudes § 4.1(1)(a). "Where the instrument is a deed, we construe the instrument as we

51

would any deed.  Our paramount concern in construing a deed is to ascertain the intentions of the parties." *Lazy Dog*, 965 P.2d at 1235.[18]

### 3. The Conservation Easement Amendment Was Improper

¶ 109    GLP argues that the court erred by concluding that the "Deed of Conservation Easement" was "intended to benefit the 'Members of [Giberson]'s family and those who live in the thirteen (13) platted lots." Further, it contends that the conservation easement does not grant rights to the lot owners, but only reserves rights for Giberson and, in turn, itself.  Therefore, it argues that the trial court incorrectly concluded that the amended conservation easement couldn't modify Sandri's and Ferrari's rights to use the conservation

---

[18] GLP, COOL, and the amicus curiae urge us to declare that all amendments to conservation easements are governed by property law.  But we need not reach that sweeping question.  The parties variously agree or don't contest that property law should apply to our review of the conservation easement amendment at issue here, and we agree.  "Courts exist for the purpose of deciding live disputes involving '"flesh-and-blood" legal problems with data "relevant and adequate to an informed judgment."'" *People v. Lybarger*, 700 P.2d 910, 915 (Colo. 1985) (quoting *New York v. Ferber*, 458 U.S. 747, 767-68 (1982)).  "A court, therefore, should avoid an advisory opinion on an abstract proposition of law." *City & Cnty. of Denver v. Consol. Ditches Co. of Dist. No. 2*, 807 P.2d 23, 38 (Colo. 1991).

property. Instead, GLP says, they have just a mere license or privilege to use the land. We disagree.

¶ 110 We first turn to the plain language of the conservation easement and section 17.D, its amendment provision.

> If the circumstances arise under which an amendment to or modification of this Deed of Conservation Easement would be appropriate, [Giberson] and [COOL] are free to jointly amend this Deed of Conservation Easement; provided that no amendment shall be allowed that will affect the qualifications of this Deed of Conservation Easement under any applicable laws. *Any amendment must be consistent with the conservation purposes of this Deed of Conservation Easement* and may not affect its perpetual duration.

(Emphasis added.)

¶ 111 The trial court rightly determined that, by its plain language, the conservation easement prevents any amendment that would be inconsistent with its purposes. The statement of purpose provides the following:

> The purpose of this Deed of Conservation Easement is to preserve and protect in perpetuity the agricultural character, wildlife habitat, private open space and scenic qualities of the Conservation Property and to prevent uses of the Conservation Property that will significantly impair or interfere with the Conservation Values of the Conservation

53

Property.  *It is also the purpose of this Deed of Conservation Easement to allow the agricultural and private recreational uses of the Conservation Property, which are consistent with the foregoing goals, to continue in perpetuity, and as is set forth herein.*

(Emphasis added.)

¶ 112     Additionally, the conservation easement expressly reserves the following rights in perpetuity:

*Passive Recreational Uses.*  Members of [Giberson]'s *family and those who live in the thirteen (13) platted lots shown on the Giberson Preserve Plat* recorded at Reception No. 375700 on September 1, 1989 in the Records of the Summit County, Colorado Clerk and Recorder and their guests, permit[t]ees (those given permission) and invitees *may use the Conservation Property for non-commercial recreational usage* deemed appropriate by [Giberson] including but not limited to walking, hiking, non-motorized mountain biking, skiing, snowshoeing, hunting, fishing, horseback riding, snowmobiling, camping, nature studies and picnicking.

(Second emphasis added.)

¶ 113     "Our goal in interpreting a recorded instrument is to ascertain and give effect to the intentions of the party or parties who created the instrument."  *802 E. Cooper, LLC v. Z-GKids, LLC*, 2023 COA 48,

54

¶ 21 (citing *Lazy Dog*, 965 P.2d at 1235). "We ascertain the parties' intent primarily from the language of the instrument itself." *Id.*

¶ 114 A plain reading of the conservation easement demonstrates that it reserves, in perpetuity, the right of those who live on the thirteen lots — such as Sandri and Ferrari — to use the conservation easement area for passive recreation. The purpose of the conservation easement is, in part, to provide for this private recreational use. *See Pulte Home Corp. v. Countryside Cmty. Ass'n*, 2016 CO 64, ¶ 23 (In interpreting a recorded instrument, "we give words and phrases their common meanings and will enforce such documents as written if their meaning is clear." And "[l]ike contracts, we construe them as a whole, seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless.").

¶ 115 The amendment to the conservation easement violated this plain purpose. It provided the following:

> *Passive Recreational Uses.* Members of [GLP] and their families and guests are permitted to use the Conservation Property as determined by [GLP] in accordance with this Deed of Conservation Easement. Those who live in the thirteen (13) platted lots shown on the Giberson Preserve Plat . . . and their

accompanied family members, guests and tenants *are permitted, at the discretion of [GLP]*, to use the Conservation Property for non-commercial recreational usage which may include walking, hiking, non-motorized biking, cross country skiing, snowshoeing, sledding, nature studies, and picnics.  Allowed activities are restricted to designated areas.

(Second emphasis added.)

¶ 116   The trial court succinctly summarized the differences between the original conservation easement and the amended version.

[T]he Amended Conservation Easement attempts to limit not just *uses* but *users*.  It only allows the family, guests, and tenants of lot owners to use the Conservation Property "at the discretion of [GLP]." . . .  Under the Amended Conservation Easement, [GLP] now has "the right to honor existing access or other easements across the Conservation Property."

¶ 117   Under the amended conservation easement, GLP, at its pleasure, could prohibit Sandri or Ferrari from accessing the conservation easement property, despite the fact that the easement prohibited changing this aspect of their right to use the property. This amendment conflicted with the conservation purposes of the

conservation easement and, as to Sandri and Ferrari, affected its perpetual duration.[19]

¶ 118    Thus, the amended conservation easement was improper, and the lot owners retain the rights "that the Grantor 'expressly reserved in perpetuity' in the original Conservation Easement." We discern no error in the trial court's conclusion to that effect.

## IV.    Attorney Fees

¶ 119    The parties each make a request for attorney fees, which we address in turn.

¶ 120    Sandri requests fees under Rule 105; C.R.C.P. 57; section 38-33.3-123(1)(c), C.R.S. 2024; section 38-35-109(3), C.R.S. 2024; and the 2017 covenants. We deny his requests under Rule 105, Rule 57, and section 38-35-109(3) as meritless. As for his request under section 38-33.3-123(1)(c), CCIOA's fee-shifting provision applies retroactively to "all common interest communities created within this state before July 1, 1992, with respect to events and

---

[19] For example, after GLP and COOL executed the amended conservation easement, GLP closed a trail near Ferrari's property. The trial court found that GLP impermissibly "closed this particular trail in an effort to specifically prevent Ferrari from accessing the Open Space." To the extent that GLP challenges this finding, we discern no error.

circumstances occurring on or after July 1, 1992."

§ 38-33.3-117(1). As determined above, no common-interest community was created, and no party brought a claim to enforce CCIOA's provisions. Thus, CCIOA's fee-shifting provision does not apply here.

¶ 121 However, the 2017 covenants contain a fee shifting provision, section 17.4, which specifies that in any dispute between GHOA and a lot owner, the prevailing party "shall be awarded all fees, costs and expenses incurred by it in such proceeding, including reasonable attorneys' fees." GHOA sued Sandri under these covenants in a clear dispute over their applicability. GHOA appealed its trial court loss, and Sandri and Ferrari have successfully defended on appeal their win that the 2017 covenants are not binding on them.

¶ 122 Likewise, the conservation easement, section 7.b, specifies that if a party commences legal action to enforce the easement, "any reasonable costs incurred by the prevailing party in such action in connection with enforcing the terms of this Deed of Conservation Easement, including, without limitation, any reasonable costs of suit and reasonable attorneys' fees, shall be borne by the

58

non-prevailing party." Ferrari has successfully defended his win against GLP on the conservation easement claim.

¶ 123 We note that both fee-shifting provisions apply only to a prevailing party in a proceeding. This matter features multiple parties and a myriad of claims, some of which were not part of this appeal. "[W]here either party could arguably be considered the 'prevailing party,' the trial court is in the best position to evaluate the relative strengths and weaknesses of each party's claims, the significance of each party's successes in the context of the overall litigation, and the time devoted to each claim." *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 231 (Colo. 2004); *see also Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 504 (Colo. App. 2003) (holding that trial court is the in best position to determine which party ultimately prevailed for purposes of awarding attorney's fees). At the time of appeal, the trial court had not determined the prevailing parties. The trial court is authorized to award Sandri and Ferrari their reasonable attorney fees incurred on appeal from GLP and GHOA if it determines that they are prevailing parties in the litigation.

## V. Disposition

¶ 124 The trial court's Rule 60 order is affirmed. That portion of the trial order concerning Sandri's claim against GLP that the 2017 covenants impermissibly expanded the scope of the private access easement to provide access not only to Lots 7 through 10 but also to the open space is reversed. The remainder of the judgment is affirmed.

¶ 125 The matter is remanded to the trial court (1) for further findings of fact and conclusions of law on Sandri's claim that GLP improperly expanded access to the PAE; (2) to award appellate fees due to Sandri and Ferrari, if it determines they are prevailing parties, from GHOA and GLP; and (3) for any further proceedings consistent with this opinion that the trial court determines are necessary.

JUDGE GOMEZ and JUDGE RICHMAN concur.