24CA1092 Marin Metro v Colorado Bondshares 06-12-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1092
Arapahoe County District Court No. 22CV30866
Honorable Ben L. Leutwyler III, Judge

Marin Metropolitan District, a quasi-municipal corporation and political subdivision of the State of Colorado,

Plaintiff-Appellee,

v.

Colorado Bondshares – A Tax Exempt Fund and UMB Bank, N.A.,

Defendants-Appellants,

and

Century at Landmark, LLC,

Interested Party-Appellee.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE SCHUTZ
Fox and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 12, 2025

Anderson Notarianni McMahon LLC, Kimberly A. Bruetsch, Denver, Colorado, for Plaintiff-Appellee

Kutak Rock LLP, Neil L. Arney, Thomas W. Snyder, Kathleen F. Guilfoyle, Denver, Colorado, for Defendants-Appellants

Fox Rothschild LLP, Marsha M. Piccone, Patrick J. Casey, Risa B. Brown, Denver, Colorado, for Interested Party-Appellee

¶ 1     This appeal arises from the latest lawsuit involving a special district, owners of land within that district, the tax exempt fund that purchased the bonds, and the bank that held the bond proceeds in trust.  *See Landmark Towers Ass'n v. UMB Bank, N.A.*, 2018 COA 100, ¶¶ 1-13 (*Landmark*).

¶ 2     In this case, Marin Metropolitan District (MMD), sought a declaratory judgment holding that it could not be compelled to impose a 2008 mill levy on approximately eleven acres of vacant land (vacant land) owned by Century at Landmark, LLC (Century), which is the only property that remains within MMD's boundaries. MMD named as defendants Colorado Bondshares — A Tax Exempt Fund (Bondshares), which owns the bonds, and UMB Bank, N.A. (UMB), which originally held the bond proceeds in trust. Bondshares and UMB asserted various defenses and counterclaims related to the enforceability of the bonds and mill levy.  The suit included Century as an interested third party.

¶ 3     The parties filed multiple motions for summary judgment.  The district court granted MMD's motion in part and denied Bondshares and UMB's motions.  The parties tried the remaining claims to the court.  After finding that the Century property derived no benefit

1

from the bond proceeds, the district court denied all of UMB and Bondshares' claims and entered judgment in favor of MMD.

¶ 4    Bondshares and UMB appeal the district court's summary judgment orders and its final judgment entered after the bench trial. We affirm.

I.    Background

¶ 5    Zachary Davidson developed property in the City of Greenwood Village (Greenwood Village). By 2007, Davidson had constructed two high-rise condominium towers (Landmark Towers) owned by Landmark Towers Association, Inc. (Landmark), an entity which Davidson controlled.

¶ 6    In 2007, Davidson, or one of his closely held development entities, acquired the vacant land, which is adjacent to the Landmark Towers. Davidson decided to form MMD to finance, own, and manage the infrastructure necessary to develop the vacant land. As a condition to obtaining Greenwood Village's approval for the formation of MMD, Davidson had to provide Greenwood Village with a service plan that addressed the scope of the public improvements to be built in the district, the amount of bonds that

would be required to fund the creation of those improvements, and how those bonds would be repaid.

¶ 7     The service plan requirements created a problem for Davidson. From the beginning, it was clear that, even once the vacant land was fully developed and sold out, the properties on the vacant land would not have a combined assessed value to provide sufficient revenue to repay the bonds needed to fund the public improvements.  In short, a special district that included only the vacant land was not financially viable.

¶ 8     So Davidson developed a fraudulent scheme.  To gain Greenwood Village's approval for the formation of MMD, Davidson included the Landmark Towers within MMD's boundaries, thereby providing a sufficient tax base to repay the bonds necessary to develop the vacant land.  Upon its inclusion in MMD, Landmark Towers provided 90% of the assessed value of all of the property in MMD, while the vacant land provided only 10%.  But all of the infrastructure proposed to be financed and operated by MMD was located only on the vacant land.  Based on the projected cash flows created by the Landmark Towers, Greenwood Village authorized the

formation of MMD, including its authority to issue in excess of $30 million in bonds.

¶ 9    At the time MMD was formed, the individual condominiums at Landmark Towers were in the process of being sold to the public. As a condition to approve the service plan, Greenwood Village required Davidson to notify these prospective purchasers of their inclusion in MMD. Davidson failed to do so.

¶ 10    In 2008, MMD issued over $30 million in bonds to fund the improvements. Bondshares purchased the bonds. MMD's bond resolution included a trust indenture stating that it would annually impose a debt service mill levy on all taxable property within MMD to generate the revenue necessary to satisfy the bonds and associated interest. The proceeds from the sale of the bonds were specially earmarked to fund the infrastructure improvements contemplated by the MMD service plan.

¶ 11    UMB held the bond sale proceeds in trust. Davidson set up a mechanism that allowed him to draw on the bond funds. He only needed UMB's approval for the reimbursements, not MMD's. By the end of 2008, Davidson had requested and received $8 million, purportedly to fund construction of the infrastructure. However, no

4

improvements were ever built. Davidson misappropriated the bulk of the $8 million for personal use.

¶ 12 In August 2009, MMD hired an independent engineer to determine how much of the disbursed funds were eligible for public expenses for tax purposes. The report eventually established that some funds had been misappropriated and listed the expenses that were potentially public expenditures.

¶ 13 Davidson's company filed for bankruptcy in August 2009, and Davidson personally filed for bankruptcy in early 2010. Late in 2012, Davidson was indicted for embezzlement and misuse of public funds; he died by suicide shortly thereafter. UMB returned the remaining bond proceeds it was holding (about $13 million) to Bondshares. MMD imposed a mill levy on the property within the district for six years, between 2008 and 2013. The district paid an additional $13 million in principal and $11.5 million in interest to Bondshares.

¶ 14 In 2011, Landmark sued MMD to prevent MMD from further assessing the mill levy against the Landmark Towers condominiums. After a bench trial in 2013, the trial court permanently enjoined MMD from imposing the mill levy on the

condominiums.  In 2018, a division of this court affirmed that injunction in *Landmark*.

¶ 15    Century purchased the vacant land in 2016.  At the time, the injunction barring imposition of the mill levy was in full force and effect.  In 2021, Greenwood Village petitioned to exclude Landmark Towers from MMD.  The trial court granted the petition, and the exclusion order took effect at the end of 2021.  Thus, the vacant land is the only property that remains part of MMD.  MMD has no funds with which to fund the public improvements contemplated by MMD's service plan and the bond indenture.

¶ 16    In 2020, Bondshares sent a letter to MMD's counsel claiming that MMD had an outstanding balance of approximately $18 million that was "due and owing" under the trust indenture.  The letter asserted that MMD was still required to set a debt service mill levy on the unimproved lot within the district to repay the bonds, and it demanded MMD set a levy on the vacant land.

¶ 17    In 2022, MMD filed a complaint for the entry of a declaratory judgment and injunctive relief to establish that Bondshares could not compel MMD to impose a mill levy on the vacant land.  Both parties moved for summary judgment.

¶ 18    The district court determined that MMD was entitled to the entry of judgment on its claim that Bondshares was barred by the doctrine of issue preclusion from relitigating *Landmark*'s holding that the mill levy was a special assessment rather than an ad valorem tax.  The court also determined that MMD's claims were not barred by section 11-57-204, C.R.S. 2024, or section 31-25-538(2), C.R.S. 2024.  The court denied the parties' competing motions that hinged on the issue of whether the vacant land received a benefit from expenses paid with the bond proceeds because there were factual disputes regarding that issue.

¶ 19    The parties proceeded to trial to determine if the vacant land benefitted from any improvements and related expenditures funded by the bond proceeds.  After the trial was completed, the court entered detailed factual findings and legal conclusions from which it determined that the vacant land did not benefit from any of the bond expenditures and, therefore, imposition of the mill levy against the vacant land would violate Century's due process rights.  Based on this conclusion, in concert with its previous summary judgment rulings, the court entered judgment in favor of MMD and against Bondshares and UMB on all claims.  The order declared that the

bond resolution and trust indenture are void and unenforceable, the bond debt is discharged, and enjoined Bondshares and UMD from attempting to compel MMD to impose a mill levy against the vacant land.

## II.  Analysis

### A.  The Nature of the Mill Levy

¶ 20    Bondshares and UMB argue that the district court erred when it concluded that the mill levy was a special assessment rather than an ad valorem tax.  The court held that Bondshares and UMB were precluded from relitigating this issue, which was resolved by *Landmark.*

¶ 21    We perceive no error in the district court's conclusion that issue preclusion barred Bondshares and UMB from relitigating the determination that the mill levy was not an ad valorem tax.  Moreover, even if issue preclusion did not bar relitigation of the issue, we conclude on the merits that the mill levy was a special assessment, not an ad valorem tax.

### 1. Issue Preclusion

#### a. Standard of Review and Applicable Law

¶ 22      "The purpose of issue preclusion is to 'bar relitigation of an issue.'" *Madalena v. Zurich Am. Ins. Co.*, 2023 COA 32, ¶ 21 (quoting *Villas at Highland Park Homeowners Ass'n v. Villas at Highland Park, LLC*, 2017 CO 53, ¶ 29). Thus, issue preclusion prevents parties from relitigating an issue that has already been decided in a prior court proceeding, provided certain conditions are met. *Sunny Acres Villa, Inc. v. Cooper*, 25 P.3d 44, 47 (Colo. 2001).

¶ 23      Issue preclusion applies if

> (1) the issue sought to be precluded is identical to an issue actually determined in the prior proceeding; (2) the party against whom [issue preclusion] is asserted has been a party to or is in privity with a party to the prior proceeding; (3) there is a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.*

¶ 24      The application of "[i]ssue preclusion presents a question of law that we review de novo." *Madalena*, ¶ 25 (quoting *Villas at Highland Park Homeowners Ass'n*, ¶ 26).

¶ 25    Bondshares and UMB do not dispute that elements two, three, or four were satisfied.  Thus, we focus our analysis on the first element.

b.    The Parties' Contentions

¶ 26    Bondshares and UMB argue that the issue they raised in the district court regarding the mill levy is substantively different than the issue they raised in the trial court in *Landmark*.  Specifically, they argue that in *Landmark*, the court determined that the levy was a special assessment because the Landmark Towers were included, without the residents' knowledge, in the special district.

¶ 27    Now that the Landmark Towers property has been excluded from the special district by court order, they argue, the levy is an ad valorem tax as it relates to the vacant land.  Bondshares and UMB argue that Century purchased the vacant land knowing that it was the sole remaining property in the special district and the contemplated infrastructure was intended to benefit the vacant land.  They reason that the applicability of the mill levy to the vacant land presents a different issue than *Landmark* decided.

10

## c.    Analysis

¶ 28    In applying the first element of issue preclusion to the facts of this case, we conclude that the controlling question is whether the decision in *Landmark* — that the mill levy is a special assessment, rather than an ad valorem tax — resolves the same issue here.  We conclude it does.

¶ 29    The correct framing of the issue presented obviously dictates the conclusion.  Recognizing that reality, Bondshares and UMB attempt to frame the issues in the two cases differently, arguing that the issue decided by *Landmark* was whether the mill levy was a special assessment *as applied to the Landmark Towers* property while the question presented here was whether the mill levy was a special assessment *as applied to the vacant land.*

¶ 30    But Bondshares and UMB's attempt to reshape the issues presented in both cases runs into multiple obstacles.  First, the division in *Landmark* concluded that "[t]he levy at issue in this case funds purely local improvements directly and specifically benefiting only the [vacant land].  It does not fund 'the general expenses of government.'  It is therefore a special assessment, not a tax." *Landmark*, ¶ 33 (footnote omitted) (quoting *Bloom v. City of Fort*

11

*Collins*, 784 P.2d 304, 307 (Colo. 1989)).  No portion of *Landmark* states that its conclusion that the mill levy is a special assessment is limited only to the Landmark Towers property.

¶ 31    Second, Bondshares and UMB concede that the nature of the mill levy must be assessed as of the time the mill levy was approved by MMD.  *See Barber v. Ritter*, 196 P.3d 238, 248 (Colo. 2008) ("To determine whether a government mandated financial imposition is a 'fee' or a 'tax,' the dispositive criteria is the primary or dominant purpose of such imposition at the time the enactment calling for its collection is passed." (citing *Zelinger v. City & Cnty. of Denver*, 724 P.2d 1356, 1358 (Colo. 1986))).  And at that time, as the division in *Landmark* concluded, the mill levy was not intended to generate any revenue for constructing or operating improvements on the Landmark Towers property.

¶ 32    Relatedly, Bondshares and UMB fail to cite any authority holding that a mill levy, at the time of passage, may be a special assessment as it relates to some portion of the property it is intended to encumber but, at the same time, is an ad valorem tax against other property in the district.  MMD's answer brief noted the absence of any supporting authority on this central point.  In

their reply brief, Bondshares and UMB acknowledge this void and, even then, fail to cite any authority supporting their contention.

¶ 33    In the face of this void, Bondshares and UMB argue that *Landmark* supports their position. Particularly, they note that *Landmark* held that the "the formation of [MMD] . . . , and the resulting levying of the Landmark [Towers] owners' properties, violated the Landmark [Towers] owners' rights to due process." *Landmark*, ¶ 28. But the finding that the mill levy was a special assessment that violated the Landmark Towers owners' due process rights does not support a conclusion that the levy was a special assessment against Landmark Towers but an ad valorem tax on the vacant land.

¶ 34    Bondshares and UMB next turn to the language in *Landmark* stating that "the injunction doesn't require [MMD] to impose taxes on anyone or on any property. If [MMD] decides to impose a true tax, it can exclude [Landmark Towers] from the District." *Id.* at ¶ 48. Bondshares and UMB argue that this language supports their contention that even though the levy is a special assessment against the Landmark Towers property, it is an ad valorem tax against the vacant land. But that's not what the quoted language

says. Indeed, to the contrary, the use of the word "decides" and the reference to excluding the Landmark Towers property suggests something that could happen in the future. But MMD took no further action to pass an ad valorem tax that would apply only to the vacant land. Instead, Bondshares and UMB are trying to unilaterally convert the mill levy from a special assessment into an ad valorem tax without any subsequent enabling action being taken by MMD. Neither *Landmark* nor any other authority cited by Bondshares and UMB supports this position.

¶ 35    In sum, we conclude that *Landmark*'s holding that the mill levy is a special assessment resolves the same issue presented here — whether the mill levy is a special assessment or an ad valorem tax. Thus, the first element of issue preclusion is satisfied, and because the parties do not dispute the remaining elements, the district court did not err by applying issue preclusion to preclude Bondshares and UMB from now treating the mill levy as an ad valorem tax.

¶ 36    Ad Valorem Taxes and Special Assessments

14

¶ 37    In addition, treatment of the levy as a special assessment rather than an ad valorem tax is consistent with the general principles applicable to such taxes.

¶ 38    "An ad valorem tax is a tax upon various classes of real and personal property located within the territorial limits of the taxing authority." *Bloom*, 784 P.2d at 307. An ad valorem tax must be uniformly imposed on real property within the boundaries of the taxing authority. *Landmark*, ¶ 42. Similarly, under the Colorado Constitution, "[e]ach property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax." Colo. Const. art. X, § 3(1)(a).

¶ 39    In contrast, "[t]he essential characteristic of a special assessment is that it must confer some special benefit to the property assessed." *Bloom*, 784 P.2d at 308. As the supreme court explained,

> The burden of the assessment falls on the property owners because "the benefits they receive from the particular improvements are different from the benefits they enjoy in common with other property owners." *Id.* A special assessment for a local improvement, therefore, must specifically benefit or enhance

15

> the value of the premises assessed "in an amount at least equal to the burden imposed." [*Reams v. City of Grand Junction,* 676 P.2d 1189, 1194 (Colo. 1984)]*; see also Satter v. City of Littleton,* 185 Colo. 90, 97, 522 P.2d 95, 98 (1974); *Pomroy v. Board of Public Waterworks,* 55 Colo. 476, 479, 136 P. 78, 80 (1913). The funds generated by a special assessment cannot be diverted to other purposes, since the imposition of the assessment "upon a particular class of taxpayers can be justified only to the extent that such taxes are equivalent to special benefits conferred upon those taxpayers." *Reams,* 676 P.2d at 119.

*Bloom,* 784 P.2d at 308.

¶ 40    Bondshares and UMB's urged interpretation of the mill levy would run contrary to the fundamental requirement that an ad valorem tax must be uniformly imposed against the same class of properties within the taxing authority. Instead, enforcement of the mill levy as they urge would have required the mill levy to be treated as an unenforceable special assessment against the Landmark Towers, but as an ad valorem tax against the vacant land. This did not and could not happen based on the requirements of an ad valorem tax. *See* Colo. Const. art. X, § 3(1)(a).

¶ 41    The subsequent order excluding the Landmark Towers from MMD also confirms that the mill levy was not and could not be

16

treated as an ad valorem tax. Under section 32-1-503(1), C.R.S. 2024,

> For the purpose of retiring the special district's outstanding indebtedness and the interest thereon existing at the effective date of the exclusion order, the special district shall remain intact, and the excluded territory shall be obligated to the same extent as all other property within the special district but only for that proportion of such outstanding indebtedness and the interest thereon existing immediately prior to the effective date of the exclusion order.

¶ 42    Despite the requirements of section 32-1-503(1), the exclusion order did not and could not provide that Landmark Towers remained liable for repayment of any portion of the subject bonds. Thus, the requirement that an ad valorem tax must be uniformly imposed against all property within the district at the time the debt was incurred could not be effectuated when the bonds and mill levy were authorized and cannot be effectuated now.

¶ 43    For these reasons, the conclusion that the mill levy is a special assessment, in addition to being dictated by issue preclusion, is mandated by the controlling legal distinctions between an ad valorem tax and a special assessment. The district court therefore did not err by concluding that the mill levy was — at the time it was

17

imposed — a special assessment, and it remains a special assessment now notwithstanding the subsequent exclusion of Landmark Towers from MMD.

¶ 44     Recognizing the likelihood of this conclusion, Bondshares and UMB alternatively claimed in the district court that the mill levy should be treated as an enforceable special assessment against the vacant land because the proceeds from the bonds provided the vacant land with material benefits.  We turn now to that argument.

## B.     Value to Century Property

¶ 45     Recall that the district court denied the parties' motions for summary judgment with respect to whether the special assessment provided value to the vacant land because the resolution of this issue required the court to resolve disputed issues of fact.  Thus, the central purpose of the trial was to resolve this dispute.  After hearing the evidence, the district court made detailed factual findings and concluded that the mill levy provided no value to the vacant land and was therefore an unenforceable special assessment.  Bondshares and UMB appeal that finding.

### 1. Standard of Review

¶ 46    We apply a mixed standard of review to orders entered after a trial before a judge. *Jehly v. Brown*, 2014 COA 39, ¶ 8. We review the district court's factual findings for clear error. *Id.* A factual finding is clearly erroneous only when it lacks any support in the record. *Cronk v. Bowers*, 2023 COA 68M, ¶ 12. We review the court's legal conclusions de novo. *See Frisco Lot 3, LLC v. Giberson Ltd. P'ship, LLLP*, 2024 COA 125, ¶ 66.

¶ 47    We agree with Bondshares and UMB that the ultimate conclusion of whether a special assessment provides a sufficient benefit to a parcel of property to be enforceable presents a question of law. *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12. But we also agree with MMD that the answer to that question turns on the court's assessment of the evidence related to fact-intensive issues, which we review for clear error. *Id.*

### 2. The Parties' Contentions

¶ 48    Bondshares and UMB argue that the district court improperly concluded that private expenditures and soft costs cannot be considered a benefit, and that benefits must continue indefinitely to be compensable. Bondshares and UMB also argue that the court

erred by not giving appropriate weight to evidence that MMD, after learning of Davidson's fraudulent conduct, procured a study for tax purposes to assess whether any of the $8 million paid to Davidson or his affiliated entities could be treated as eligible public expenses as opposed to private expenditures.

¶ 49 MMD responds that the district court's determination that the $8 million in expenditures provided no benefit to the vacant land is predicated on a series of factual findings that are supported by the record. In addition, MMD argues that the district court did not conclude that soft costs and private expenditures can never result in benefits that are reimbursable. Rather, MMD argues, the court simply concluded that the soft costs and private expenditures in this case provided no benefit to the vacant land. As to the report concerning potential benefits for tax purposes, MMD argues that the district court correctly concluded that whether an expenditure qualifies as a public expenditure for MMD's tax purposes sheds no meaningful light on whether the same expenditures provided a benefit to the vacant land.

¶ 50 We agree with MMD on both the factual and legal contentions.

### 3. Analysis

¶ 51 In support of its conclusion that the expenditures provided no benefit to the vacant land, the district court made extensive factual findings, including the following:

- "The evidence and testimony presented at trial demonstrates that the [vacant land] has received no benefit from the 2008 Bonds."

- [MMD's] accountant, who served in that capacity from early 2009 to 2022, testified that "no actual public infrastructure was built, despite the expenditure of funds, and no benefit was conveyed to the [vacant land] by those expenditures."

- A Bondshares representative who visited the vacant land several times stated he was not aware of any improvements that were built on the vacant land, saying, "I'll be honest with you, I still don't know what was actually built."

- "Design, engineering, architecture, and other 'soft' costs incurred by Davidson did not enhance the value of the [vacant land]. . . . [N]obody has located these design plans, and in any event, they have no value today."

¶ 52    Based on these findings, and many others, the district court concluded that "no evidence has been presented that any actual benefit has been conveyed to the [vacant land] from the expenditure of bond funds by Davidson and/or [MMD]."  There is a plethora of record evidence to support this conclusion, and we therefore will not disturb it.

¶ 53    We also reject Bondshares and MMD's argument that the audit for tax purposes has any bearing on the question of whether expenditures made by Davidson or MMD provided any benefit to the vacant land.  We fail to see how a report assessing whether the expenditures may be claimed as a "public expenditure" for tax purposes informs the analysis of whether any of the expenditures actually benefitted the vacant land.  And Bondshares and UMB provide no meaningful analysis to support their implicit contention that the two assessments should be treated as interchangeable.

¶ 54    Finally, as illustrated by the court's detailed factual findings, it did not operate from an erroneous legal assumption that soft costs and private expenditures can never qualify as a benefit to a special district or the property located therein.  Rather, the court found

22

only that the soft costs and private expenditures in this case have not provided, and will not provide, any benefit to the vacant land.

¶ 55 We perceive no error in the district court's conclusion that the expenditures therefore did not provide a benefit to the vacant land that would justify imposition of the mill levy. Recall that a special assessment must not only provide a theoretical benefit to the taxed property, but it must also provide a benefit that "specifically benefit[s] or enhance[s] the value of the premises assessed 'in an amount at least equal to the burden imposed.'" *Bloom*, 784 P.2d at 308 (quoting *Reams*, 676 P.2d at 1194). Using this measure, we perceive no error in the district court's conclusion that the bonds provided no benefit to the vacant land.

¶ 56 We also reject Bondshares and UMB's argument that no due process violation occurred even if the bonds provided no benefit to the Century property because Century purchased the vacant land with knowledge that the bond and mill levy resolution existed. In making this argument, Bondshares and UMB draw on case law developed in the context of a due process claim under the Takings Clause of the Fifth Amendment. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just

compensation."). In that context, the supreme court has stated that the "'reasonable investment-backed expectations' of the regulated party is the dispositive factor in takings analysis when the regulated party is 'on notice' of the extent of the government's regulatory authority over its property." *State Dep't Health v. Mill*, 887 P.2d 993, 1000 (Colo. 1994) (quoting *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1072 (Fed. Cir. 1994)). From there, Bondshares and UMB assert that when Century purchased the vacant land, the bonds and associated mill levy were public knowledge, as was the fact that the vacant land was included in MMD. Therefore, the argument continues, Century acquired the vacant land with full notice that it was subject to the bonds and mill levy and no due process violation occurred.

¶ 57 We reject these contentions for multiple reasons. First, MMD's claim that due process prohibited it from assessing the mill levy on the vacant land was not based on the Takings Clause, or the case law developed thereunder. Rather, the claim was based on Colorado's due process jurisprudence holding that a special assessment cannot be imposed on property that does not receive a commensurate benefit from the funds generated by the special

24

assessment. *Bloom*, 784 P.2d at 308. This analysis does not depend upon whether the property owner had notice of the special assessment prior to purchasing the subject property. Thus, UMB and Bondshares' argument is premised on a legal principle that does not apply to this case.

¶ 58 Second, we disagree with the factual premise of the argument. Century did not make its purchase knowing that the vacant land alone would bear the burden of repaying the bonds, even though the bonds provided no benefit to its property. Indeed, at the time of the purchase, an injunction was in place prohibiting MMD from imposing the mill levy. Moreover, the Landmark Towers property remained in the district and the mill levy was passed based on the assumption that the bonds would be repaid by imposing the mill levy against both the vacant land and the Landmark Towers property. Thus, the factual premise of Bondshares and UMB's takings argument is also unsupported.

¶ 59 We therefore reject Bondshares and UMB's argument that the district court's due process ruling was wrong because Century purchased the property with notice of the bonds and mill levy.

## C.   Statutes of Limitation

¶ 60    Bondshares and UMB argue that the district court erred by rejecting their affirmative defense asserting that MMD's claim for declaratory relief was time barred under two different statutes. We address each statute in turn.

### 1.   Section 11-57-212, C.R.S. 2024

¶ 61    We review a district court's statutory interpretation de novo. *Educhildren LLC v. Cnty. of Douglas Bd. of Equalization*, 2023 CO 29, ¶ 27. In doing so, "[o]ur principal goal is to effectuate the legislature's intent. To do this, we 'read a statutory scheme as a whole, "giving consistent, harmonious, and sensible effect to all of its parts,"' and we ascribe plain and ordinary meaning to its terms." *Id.* (citations omitted). We must apply the statute as written and may not add or subtract words. *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 12.

¶ 62    Section 11-57-212 provides: "No legal or equitable action brought with respect to any legislative acts or proceedings in connection with the authorization or issuance of securities by a public entity shall be commenced more than thirty days after the authorization of such securities."

¶ 63    The 2008 bond resolution that authorized the issuance of the bonds incorporated the statute. Because section 11-57-212 requires that a challenge to the "authorization or issuance of securities by a public entity" be brought within thirty days, Bondshares and UMB argue that MMD's claim for declaratory and injunctive relief concerning the bond indenture and mill levy was time barred. MMD counters that the declaratory judgment action does not challenge the resolution authorizing the issuance of the bonds, but rather challenges imposition of a mill levy on the vacant land because the bonds and associated mill levy provided no value to that property.

¶ 64    The district court concluded that the statute did not apply to MMD's claims. The court agreed that MMD did not challenge the legislative acts or proceedings associated with the authorization or issuance of the bonds. Rather, MMD sought declaratory relief to determine whether it could be compelled to impose an unconstitutional special assessment against the vacant land. While acknowledging that MMD's claim was "tangentially" related to the issuance of the bonds, the court concluded that the claim fell

outside the reach of section 11-57-212.  We agree with the district court.

¶ 65     *Landmark* addressed the applicability of section 11-57-212 to Bondshares and UMB's assertion that Landmark's claim in that case was time barred.  In rejecting the assertion, the division reasoned as follows:

> [T]he argument fails on the merits.  The statute applies, by its terms, to "the authorization or issuance of securities."  § 11-57-212.  Landmark, however, challenges, on constitutional grounds, the creation of [MMD] to include the Landmark [Towers] and the associated levies.  We won't expand the reach of the statute beyond the plain meaning of its language.  *See Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011) (if statutory language is clear, we apply the statute as written); *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo. 2005) ("We will not create an addition to a statute that the plain language does not suggest or demand.").

*Landmark*, ¶ 22.  We find this analysis persuasive.

¶ 66     Bondshares and UMB try to distinguish *Landmark*, reasoning that the Landmark Towers owners were only challenging their inclusion in the district.  But, as the division in that case made clear, it found section 11-57-212 not applicable because the Landmark Towers owners were challenging "the creation of [MMD]

28

to include the Landmark [Towers] *and the associated levies.*" *Id.* (emphasis added). And the *Landmark* division found the levy was unenforceable against the Landmark Towers owners because the levy was an unconstitutional special assessment. *Id.* at ¶ 33.

¶ 67 Here, MMD's claim for declaratory relief was premised on the contention that the levy was a special assessment that could not be imposed on the vacant land because to do so would violate Century's due process rights. In evaluating whether MMD's claim fell within the reach of section 11-57-212, we see no material distinction between the essence of MMD's claim and the claim made in *Landmark*.

¶ 68 The district court did not err by rejecting the argument that section 11-57-212 barred MMD's claims.

2. Section 31-25-538(2), C.R.S. 2024

¶ 69 Bondshares and UMB next argue that the district court erred by concluding that section 31-25-538(2) did not bar MMD's claims.

¶ 70 Section 31-25-538(2) provides that "[a]ny action brought with respect to . . . levying of any assessments . . . taken under this part 5 shall be commenced within thirty days" of "issuing [the] bonds." § 31-25-538(2). The district court held that the statute did not

29

apply because MMD's claim was not brought under part 5 of title 31, article 25, which applies to "special improvement districts," and MMD is not a special improvement district. Moreover, the court noted that MMD could not have been acting under part 5 because the bond documents were completed before part 5 was amended to allow special districts to establish a special improvement district.

¶ 71 On appeal, Bondshares and UMB assert that MMD cannot have it both ways — that is, it cannot argue, on the one hand, that the levy was a special assessment and also argue, on the other hand that section 31-25-538(2) does not apply to its claim.

¶ 72 At first blush, Bondshares and UMB's consistency argument seems persuasive. But it fails on closer examination.

¶ 73 Bondshares and UMB do not argue that MMD is, or ever was, a special improvement district. Indeed, they concede that it has always been a special district. And Bondshares and UMB also concede that in 2008, when the mill levy was authorized, special districts like MMD were not authorized to act with the powers of a

special improvement district.[1]  Not surprisingly then, none of the paperwork related to the bonds make any reference to section 31-25-538(2).  That is because MMD had no authority to act as a special improvement district and did not purport to do so.

¶ 74    Nevertheless, Bondshares and MMD argue that the district court was bound to apply section 31-25-538(2) as if MMD had been created as a special improvement district before the resolution authorizing the mill levy was passed.  As we understand its argument, it reasons that because *Landmark* concluded in 2018 that the mill levy was and is a special assessment, we must now assume that MMD properly imposed a special assessment under section 31-25-538(2) when it issued the bonds.  Alternatively, they contend that indenture and mill levy resolutions should be deemed subject to section 31-25-538(2) as of 2018, when the *Landmark* decision became final.  But Bondshares and UMB cite no authority supporting these arguments, and we are aware of none.

---

[1] In 2009, special districts were granted authority to form special improvement districts within their boundaries by following certain procedures.  *See* § 32-1-1101.7, C.R.S. 2024; Ch. 81, sec. 2, § 32-1-1101.7, 2009 Colo. Sess. Laws 298-99.  The record contains no evidence that MMD ever formed a special improvement district within its boundaries.

31

¶ 75    Ironically, during the course of the *Landmark* litigation, the defendants in that case — including UMB — argued that the court should refuse to recognize the mill levy as a special assessment because MMD had no authority to impose special assessments. In rejecting this argument, the division reasoned:

> Defendants also argue the levy couldn't have been a special assessment because, when [MMD] was created, special districts didn't have statutory authority to impose special assessments. But the fact [MMD] wasn't authorized to impose special assessments doesn't mean it didn't do so. As discussed, the nature of the levy is determined by its purpose and characteristics. If the purpose and characteristics of a levy show that it's a special assessment, then that's what it is. In the end, even if defendants are right about the state of the law at the time of the election, that means only that there's another reason for declaring the special assessment invalid.

¶ 76    *Landmark,* ¶ 33 n.7. Switching horses, Bondshares and UMB now ask us to apply section 31-25-538(2) as though MMD was acting within its authority to impose a special assessment.

¶ 77    Bondshares and UMB's current position is the product of misinterpreting or misapplying the reasoning of *Landmark.* That decision did not conclude that the mill levy was a properly authorized special assessment in 2008, or that it became a properly

32

authorized special assessment once *Landmark* was announced. Rather, the division concluded that MMD had no authority to impose the special assessment that it sought to impose, whether in 2008 or 2018.

¶ 78     In sum, MMD took no action in this case as a special improvement district, and nothing about the decision in *Landmark* transforms the invalid special assessment into a validly authorized and adopted special assessment within the purview of section 31-25-538(2).  Thus, the district court properly concluded that the statute did not bar MMD's declaratory judgment claim.

### D.     Bondshares and UMB's Counterclaims

#### 1.     Colorado Constitution Article XI, Section 6(1)

¶ 79     Bondshares and UMB argue that article XI, section 6(1) of the Colorado Constitution precluded MMD's claim that the mill levy could not be assessed against the vacant land.  They argue that the bonds were a general obligation debt that could not be repealed until the indebtedness was "fully paid or discharged."

##### a.     Standard of Review and Applicable Law

¶ 80     We review de novo the district court's interpretation of the Colorado Constitution.  *Qwest Corp. v. Colo. Div. of Prop. Tax'n,*

2013 CO 39, ¶ 11.  The relevant portion of the Colorado Constitution provides, "No political subdivision of the state shall contract any general obligation debt by loan . . . except by adoption of a legislative measure which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged."  Colo. Const. art XI, § 6(1).

### b.    Analysis

¶ 81    As we have previously concluded, the mill levy was and is a special assessment.  A general obligation debt exists only when specific circumstances are satisfied, including that "the obligation requires use of revenue from a tax otherwise available for general purposes."  *Fischer v. City of Colorado Springs*, 260 P.3d 331, 335 (Colo. App. 2010).  Consistent with its status as a special assessment, the mill levy was not available for general purposes.

¶ 82    In an effort to avoid this conclusion, Bondshares and UMB return to their argument that, when adopted, even though it was not a general obligation debt with respect to the Landmark Towers property, it was a general obligation debt as applied to the vacant land.  But we reject this contention for the reasons previously stated: a tax cannot qualify as a general obligation against some of

the taxing authority's property at the time that it is adopted while simultaneously qualifying as a special assessment against other property within the jurisdiction.  The mill levy, since adoption, was and remains a special assessment.

¶ 83    Thus, the district court did not err by rejecting the argument that MMD's declaratory judgment claim was barred by article XI, section 6(1).[2]

### 2.    Unjust Enrichment

¶ 84    Finally, Bondshares and UMB argue that the district court erred by rejecting their unjust enrichment claim.

---

[2] Having reached this conclusion, we need not and do not address MMD's alternative argument that the bonds have been discharged by virtue of the *Landmark* decision combined with the judgment entered in this case.  At oral argument, counsel for MMD acknowledged that the entry of the district court's declaratory order stating that the bond resolution and trust indenture are void and the debt was discharged was not necessary to resolve the question of whether the mill levy could be imposed against the vacant land. Bondshares and UMB did not directly appeal this declaration; instead they contested the declaration only as it relates to the enforcement of the mill levy against the vacant land.  Having rejected those contentions regarding the enforceability of the mill levy on other grounds, we need not and do not reach the question of whether the district court erred by declaring the bond resolution and trust indenture void and the bond debt discharged.

¶ 85    Bondshares and UMB argue that, even if the mill levy is an unenforceable special assessment, the bond proceeds unjustly enriched MMD.  Therefore, they contend, they should be allowed to recover against MMD under a theory of unjust enrichment because "it would be inequitable for the benefit to be retained without payment of the value."

### a.    Standard of Review

¶ 86    "Unjust enrichment claims require that courts make extensive factual findings to determine whether a party has been unjustly enriched.  Because careful consideration of particular circumstances is required in unjust enrichment claims, we [review] trial court determinations for abuse of discretion."  Lewis v. Lewis, 189 P.3d 1134, 1140 (Colo. 2008) (citation omitted).

### b.    Analysis

¶ 87    We perceive no abuse of discretion in the district court's determination that MMD was not unjustly enriched.

¶ 88    As a starting point, all parties acknowledge the general principle that equitable claims — such as unjust enrichment — cannot be invoked to enforce a void contract with a governmental entity.  *See Falcon Broadband, Inc. v. Banning Lewis Ranch Metro.*

36

*Dist. No. 1*, 2018 COA 92, ¶¶ 47-48 (citing *Normandy Ests. Metro. Recreation Dist. v. Normandy Ests., Ltd.*, 553 P.2d 386, 388-89 (Colo. 1976)); *Rocky Mountain Nat. Gas, LLC v. Colo. Mountain Junior Coll. Dist.*, 2014 COA 118, ¶ 31 ("[W]here a contract is void because it is not within a municipality's power to make, the municipality cannot be estopped to deny the validity of the contract."). But Bondshares and UMB rely on *Normandy Estates* to argue that an unjust enrichment claim should be recognized under the circumstances of this case. We conclude that their reliance on *Normandy Estates* is misplaced.

¶ 89   In *Normandy Estates*, a special district approved and disbursed bond proceeds to acquire an existing swimming pool and the associated acreage, but the district did not pay the full purchase price to the seller. 553 P.2d at 387-88. The special district claimed the contract to purchase was not enforceable because it had neglected to hold an election on the issue. *Id.*

¶ 90   The supreme court held that, although the contract was invalid because the required election was not held, the seller was nevertheless able to recover the land in question *or* the balance of the purchase price because allowing the special district to keep the

land without paying the full, agreed-upon price would be unjust. *Id.* at 389-90.

¶ 91 But the supreme court cautioned that the exception it was recognizing was extremely narrow:

> We note, however, that the recovery authorized by this decision is a limited one. The party dealing with the municipal entity must have acted in good faith, and the contract must be one not positively condemned by law, as distinguished from one which is merely invalid because of want of power to contract or because statutory procedure was not followed in its making. We hold, further, that there can be no recovery where the property is no longer in existence or identifiable, or where it cannot be restored to the plaintiff without serious damage to other property of the municipality.

*Id.* at 390 (citations omitted).

¶ 92 These conditions preclude the recognition of an unjust enrichment claim in this case. The money is gone. MMD does not retain any funds generated by the sale of the bonds. No improvements were ever built on the vacant land. And we have affirmed the district court's findings that the portion of the bonds that was paid out to Davidson or various vendors provided no benefit to MMD or the vacant land. The remainder of the bond proceeds were returned to MMD or used to reduce the interest and

principal of the bonds.  Thus, the proceeds of the bonds are "no longer in existence or identifiable."  *Id.*

¶ 93     Moreover, the district court concluded that the equities in this case favor MMD:

> [MMD] itself is a victim of Davidson's self-dealing and fraud.  Bondshares is a sophisticated institutional investor that knowingly took on higher risk investment opportunities; it knew that the Service Plan wasn't feasible; knew that Davidson was exerting pressure to gain free use of the bond proceeds, but simply left it up to UMB to deal with that pressure; and, should have seen that there were virtually no controls in place regarding requests for payment by the District, which were in fact requests for payment by Davidson.

¶ 94     Given the district court's detailed factual findings, which are supported by the record, we cannot say that it abused its discretion by rejecting Bondshares and UMB's unjust enrichment claim.[3]

### III.   Disposition

¶ 95     The judgment is affirmed.

---

[3] Given our disposition, we do not need to address Bondshares and UMB's argument that section 24-10-113(3), C.R.S. 2024, provides a mechanism to collect the sums it asserts remain due on the bonds.  That statute provides a mechanism for a special district to impose a mill levy to satisfy a judgment.  It is not relevant here because no judgment has been entered against MMD.

JUDGE FOX and JUDGE HARRIS concur.